Martha RIVERA; Mao Her; Alicia Alvarez; Eva Ariola; Peuang Bounnhong; Rosa Ceja; Chhom Chan; Bee Lee; Paula Martinez; Maria Domitilia Medina; Mai Meemoua; Margarita Mendoza; Bao Nhia Moua; Isidra Murillo; Maria Navarro; Vath Rattanatay; Ofelia Rivera; Sara ˋRivera;

Maria Rodriguez; Maria Ruiz; Maria Valdivia; Sy Vang; Youa Xiong; See Yang; Xhue Yang, Plaintiffs–Appellees,

v.

NIBCO, INC., an Indiana corporation, Defendant–Appellant.

No. 02–16532.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 16, 2003.

Filed April 13, 2004.

Sara Hedgpeth–Harris, Sagaser, Franson & Jones, Fresno, CA, for the appellant.

Christopher Ho, The Legal Aid Society—Employment Law Center, San Francisco, CA, for the appellees.

Rebecca Smith, The National Employment Law Project, Olympia, WA, for amici curiae The National Employment Law Project, Mexican American Legal Defense and Educational Fund, American Federation of State, County and Municipal Employees, Asian American Legal Defense and Education Fund, Asian Pacific American Legal Center, Coalition for the Humane Immigrant Rights of Los Angeles, Equal Rights Advocates, New York Immigration Coalition, Immigrant Rights Network of Iowa–Nebraska, National Council of la Raza, National Interfaith Committee for Worker Justice, Puerto Rican Legal Defense and Education Fund, Pineros y Campesinos Unidos del Noreste, and Sweatshop Watch. Brendan D. Cummins, Minneapolis, MN, for amici curiae The National Employment Lawyers Association, California Women's Law Center, and The National Partnership for Women and Families.

Before: REINHARDT, SILER,* and HAWKINS, Circuit Judges.

* Honorable Eugene E. Siler, Jr., Senior Judge for the United States Circuit Court of Appeals for the Sixth Circuit, sitting by designation.

REINHARDT, Circuit Judge:

Defendant NIBCO has brought this interlocutory appeal to challenge the validity of a protective order, fashioned by a federal magistrate and affirmed by the district court. The order prohibits NIBCO from using the discovery process to inquire into the plaintiffs' immigration status and eligibility for employment. Because NIBCO has failed to demonstrate that the protective order was either clearly erroneous or contrary to law, we affirm the district court's decision denying reconsideration of the order.

## I. Factual and Procedural Background

The plaintiffs in this dispute are twenty-three Latina and Southeast Asian female immigrants once employed as production workers at NIBCO's factory in Fresno, California.[1] All of the plaintiffs are of limited English proficiency, yet all allegedly performed their respective duties successfully during their tenure with NIBCO. Although the plaintiffs' job descriptions did not require English proficiency, sometime in 1997 or 1998, NIBCO required them to take basic job skills examinations given only in English. The plaintiffs performed poorly on the exams. NIBCO allegedly responded with a range of adverse employment consequences. Some plaintiffs were demoted or transferred to undesirable job assignments; eventually, all plaintiffs were terminated in the period between July 30, 1998 and September 24, 1998.

The plaintiffs requested and received right-to-sue letters from the EEOC and California's Department of Fair Employment and Housing ("DFEH"). Subsequently, the plaintiffs filed an action in federal court, alleging disparate impact discrimination based on national origin in violation of Title VII, 42 U.S.C. § 2000e et seq., and the California Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12940, et seq. The plaintiffs sought reinstatement (and front pay for those not electing reinstatement), backpay, compensatory and punitive damages, and attorneys fees, as well as injunctive relief enjoining NIBCO from, inter alia, continuing its English-language testing policy, and compelling it to expunge any record of wrongdoing from personnel files.

This interlocutory appeal arises out of a discovery dispute in the above action. During the deposition of plaintiff Martha Rivera, NIBCO asked where she was married and where she was born. Although Rivera had specified that she was of "Mexican ancestry" in her answers to interrogatories, Rivera's counsel instructed her not to answer any further questions pertaining to her immigration status. The plaintiffs thereafter terminated the deposition. The plaintiffs then filed for a protective order against further questions pertaining to immigration status. Their request was predicated on the claim that—because each plaintiff had already been verified for employment at the time of hiring and because further questions pertaining to immigration status were not relevant to their claims—additional questioning would have a chilling effect on their pursuit of their workplace rights.

The magistrate judge presiding over discovery issued a protective order. The order granted the plaintiffs some discovery protection for three types of questions NIBCO sought to ask. With respect to questions relating to the plaintiffs' places of birth, the magistrate judge found that

---

1. The suit was originally brought by twenty-five named plaintiffs as representatives of a similarly situated class. Plaintiffs voluntarily dismissed all class action portions of the complaint. On September 18, 2002, plaintiffs Rosa Ceja and Xhue Yang voluntarily dismissed their claims, leaving twenty-three remaining plaintiffs.

"there appears to be no dispute that each plaintiff is a member of a protected class, and [thus that] further questions regarding where each plaintiff was born has no further relevance to this action." [2] *Rivera v. NIBCO, Inc.*, 204 F.R.D. 647, 649 (E.D.Cal.2001). The magistrate judge did, however, allow NIBCO discovery concerning the plaintiffs' places of marriage, educational background, current and past employment, damages, date of birth, and criminal convictions, but limited disclosure of that information to the parties and their attorneys. *Id.* at 649. With regard to each plaintiff's immigration status, the magistrate judge barred all discovery into the matter, but did not preclude NIBCO from conducting its own independent investigation. She acknowledged that the "after-acquired" evidence doctrine could limit NIBCO's liability in the event that it discovered that some plaintiffs were not eligible for employment, but ruled that NIBCO under the circumstances did not have a right to use the discovery process to gain that information. *Id.* at 649–51(citing *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 362–63, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995)). Allowing NIBCO to obtain such information through the discovery process, she found, would unnecessarily chill legitimate claims of undocumented workers under Title VII.

NIBCO filed a motion under FED. R. CIV. P. 72(a), requesting that the district court reconsider the magistrate's ruling. The court denied the motion. *Rivera v. Nibco, Inc.*, 2001 WL 1688880 (E.D.Cal. Dec.21, 2001). It found that the defendant's various contentions misstated the magistrate's ruling, and held that it was neither clearly erroneous nor contrary to law. *Id.*

NIBCO subsequently filed a motion to certify the discovery ruling for interlocu-

tory appeal. Before the district judge ruled on the motion, however, the United States Supreme Court issued its decision in *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002) [hereinafter *Hoffman* ]. *Hoffman* held that the National Labor Relations Board lacks the discretion to award backpay to undocumented workers seeking relief for an employer's unlawful employment practices under the National Labor Relations Act. *Id.* at 151–52, 122 S.Ct. 1275. NIBCO immediately filed a second motion to reconsider, claiming that after *Hoffman*, each plaintiff's immigration status was discoverable because of its direct relevance to potential remedies. In response, the plaintiffs proposed a proceeding bifurcated into liability and damages phases. Under the plaintiffs' proposal, the case would proceed to trial on liability first. If the plaintiffs were able to prove NIBCO's liability for the alleged disparate impact violation, the court would then hold an *in camera* proceeding designed to preserve the plaintiffs' anonymity, protect their statutory rights, and avoid prejudicing the defense. The proceeding would allow each plaintiff to testify regarding her immigration status, provide documents supporting her entitlement to backpay, and provide a formal certification from the Social Security Administration attesting that she was authorized to work throughout the backpay period. The judge would make deductions from the aggregate award backpay for any plaintiff who failed to prove eligibility. Once the aggregate award was thus reduced to encompass only eligible plaintiffs, plaintiffs' counsel would then have the responsibility of giving each eligible plaintiff her share of the total.

---

**2.** Both parties stipulated to the national origin designation of each plaintiff as contained in NIBCO's representations to the EEOC.

The district court postponed its decision on whether to bifurcate the trial, denied NIBCO's request to reconsider, and granted NIBCO's motion to certify the post-*Hoffman* order denying reconsideration of the interlocutory appeal pursuant to 28 U.S.C. § 1292(b). We granted the petition for interlocutory appeal.

## II. Standard and Scope of Review

██ District courts review magistrate judges' pretrial orders under a "clearly erroneous or contrary to law" standard. FED. R. CIV. P. 72(a). This court reviews "a district court's denial of a motion to reconsider a magistrate's pretrial[protective discovery] order under that same standard." *Osband v. Woodford,* 290 F.3d 1036, 1041 (9th Cir.2002). We may not overturn a protective order simply because we might have weighed differently the various interests and equities; instead, we must ascertain whether the order was contrary to law.[3]

██ We have jurisdiction to consider orders certified for interlocutory appeal under 28 U.S.C. § 1292(b). Our scope of review is broader than the specific issues the district court has designated for appellate review. "[T]he appellate court may address any issue fairly included within the certified order because 'it is the order that is appealable, and not the controlling question identified by the district court.'" *Yamaha Motor Corp., U.S.A. v. Calhoun,* 516 U.S. 199, 205, 116 S.Ct. 619, 133 L.Ed.2d 578 (1996) (quoting 9 J. MOORE & B. WARD, MOORE'S FEDERAL PRACTICE ¶ 110.25[1], at 300 (2d ed.1995)). *See also id.* (" 'The court of appeals may review the entire order, either to consider a question different than

the one certified as controlling or to decide the case despite the lack of any identified controlling question.'") (quoting 16 C. WRIGHT, A. MILLER, E. COOPER, & E. GRESSMAN, FEDERAL PRACTICE AND PROCEDURE § 3929, at 144–145 (1977)); *Central Delta Water Agency v. United States,* 306 F.3d 938, 952 n. 10 (9th Cir.2002). In this case, the order certified is the district court's post-*Hoffman* order denying reconsideration of the protective order granted by the magistrate judge. We now turn to whether the district court was required by law to overturn or modify the protective order.

## III. Discussion

██ The magistrate judge granted the protective order at issue pursuant to FED. R. CIV. P. 26. Rule 26 states that, in general, any matter relevant to a claim or defense is discoverable. FED. R. CIV. P. 26(b). That principle is subject to limitation. After a showing of good cause, the district court may issue any protective order "which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," including any order prohibiting the requested discovery altogether, limiting the scope of the discovery, or fixing the terms of disclosure. FED.R.CIV.P. 26(c). The burden is upon the party seeking the order to "show good cause" by demonstrating harm or prejudice that will result from the discovery. *See Phillips ex rel. Estates of Byrd v. General Motors Corp.,* 307 F.3d 1206, 1210–11 (9th Cir.2002). "If a court finds particularized harm will result from disclosure of information to the public, then it balances the public and private interests to decide whether a protec-

---

**3.** When a protective order is overbroad, we may consider the principles militating in favor of and against discovery, and remand with instructions to guide the district court in modifying the protective order. *See Foltz v.*

*State Farm Mut. Auto. Ins. Co.,* 331 F.3d 1122, 1139–41 (9th Cir.2003) (considering the relevant principles and remanding with guiding instructions).

tive order is necessary." *Id.* at 1211. In this case, the protective order was justified because the substantial and particularized harm of the discovery—the chilling effect that the disclosure of plaintiffs' immigration status could have upon their ability to effectuate their rights [4]—outweighed NIBCO's interests in obtaining the information at this early stage in the litigation. We therefore hold that the district court's decision not to disturb the order was neither clearly erroneous nor contrary to law.

### A. The Harm of Disclosure

■ The protective order at issue bars discovery into each plaintiff's immigration status on the basis that allowing NIBCO to use the discovery process to obtain such information would chill the plaintiffs' willingness and ability to bring civil rights claims. *Rivera,* 204 F.R.D. at 651. By revealing their immigration status, any plaintiffs found to be undocumented might face criminal prosecution and deportation. Although NIBCO has promised not to disclose the plaintiffs' immigration status to any outside party, the district court found that requiring the plaintiffs to answer such questions in the discovery process would likely deter them, and future plaintiffs, from bringing meritorious claims.

We agree with the district court. There are reportedly over 5.3 million workers in the "unauthorized labor" force. *See* Dean E. Murphy, *A New Order: Imagining Life Without Illegal Immigrants,* N.Y. TIMES, Jan. 11, 2004, § 4, at 1. Many of these workers are willing to work for substandard wages in our economy's most undesirable jobs. While documented workers face the possibility of retaliatory discharge for an assertion of their labor and civil rights, undocumented workers confront the harsher reality that, in addition to possible discharge, their employer will likely report them to the INS and they will be subjected to deportation proceedings or criminal prosecution. *See* Br. of Amicus Curiae of National Employment Law Project, et al., 4–12. The caselaw substantiates these fears. *E.g., Sure–Tan, Inc. v. NLRB,* 467 U.S. 883, 886–87, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984) (employer reported five undocumented workers after they voted in favor of union representation); *Does I thru XXIII v. Advanced Textile Corp.,* 214 F.3d 1058, 1062–63 (9th Cir.2000) (court allowed the plaintiffs to plead their claims anonymously due to their fear of retaliatory deportation); *Fuentes v. INS,* 765 F.2d 886, 887 (9th Cir.1985) (employer reported undocumented workers he had employed for three years for less than minimum wage when they filed suit to recover wages owed), *vacated by Fuentes v. INS,* 844 F.2d 699 (9th Cir.1988); *Singh v. Jutla & C.D. & R's Oil, Inc.,* 214 F.Supp.2d 1056, 1057 (N.D.Cal.2002) (employer recruited an undocumented worker and then reported him to the INS after he filed an FLSA claim for unpaid wages); *Contreras v. Corinthian Vigor Ins. Brokerage, Inc.,* 25 F.Supp.2d 1053, 1055 (N.D.Cal.1998) (employer reported an undocumented worker

**4.** NIBCO has conceded for the purposes of these proceedings that Title VII applies to discrimination against undocumented aliens on one of the protected grounds: race, sex, national origin, etc. *Rivera,* 204 F.R.D. at 649. The parties' stipulation is consistent with what we have long assumed to be the law of this circuit. *See EEOC v. Hacienda Hotel,* 881 F.2d 1504, 1517 n. 10 (9th Cir. 1989) (assuming without deciding that undocumented workers are entitled to the protec- tions of Title VII), *overruled on other grounds by Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), *and Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *see also EEOC v. Tortilleria "La Mejor",* 758 F.Supp. 585, 590 (E.D.Cal.1991) (holding that "the protections of Title VII were intended by Congress to run to aliens, whether documented or not, who are employed within the United States").

after she filed a FLSA claim for unpaid wages).

As a result, most undocumented workers are reluctant to report abusive or discriminatory employment practices. *See United States v. Brignoni–Ponce*, 422 U.S. 873, 879, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) ("The aliens themselves are vulnerable to exploitation because they cannot complain of substandard working conditions without risking deportation."); *see also* Michael J. Wishnie, *Immigrants and the Right to Petition*, 78 N.Y.U. L. REV. 667, 676–79 (2003) (arguing that undocumented workers are reluctant to report a variety of labor and employment law violations). Granting employers the right to inquire into workers' immigration status in cases like this would allow them to raise implicitly the threat of deportation and criminal prosecution every time a worker, documented or undocumented, reports illegal practices or files a Title VII action. Indeed, were we to direct district courts to grant discovery requests for information related to immigration status in every case involving national origin discrimination under Title VII, countless acts of illegal and reprehensible conduct would go unreported.[5]

Even documented workers may be chilled by the type of discovery at issue here. Documented workers may fear that their immigration status would be changed, or that their status would reveal the immigration problems of their family or friends; similarly, new legal residents or citizens may feel intimidated by the prospect of having their immigration history examined in a public proceeding. Any of these individuals, failing to understand the relationship between their litigation and immigration status, might choose to forego civil rights litigation.

The chilling effect such discovery could have on the bringing of civil rights actions unacceptably burdens the public interest. The Supreme Court has recognized that Congress intended to empower individuals to act as private attorneys general in enforcing the provisions of Title VII.[6] *See N.Y. Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 63, 100 S.Ct. 2024, 64 L.Ed.2d 723 (1980) (finding that "Congress has cast the Title VII plaintiff in the role of 'a private attorney general,' vindicating a policy 'of the highest priority' "); *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 45, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) ("the private right of action remains an essential means of obtaining judicial enforcement of Title VII.... In such cases, the private litigant not only redresses his own injury but also vindicates the important congressional policy against discriminatory employment practices."); *see also* H.R. REP. NO. 102–40, pt. 2, at 34 (1991) (report of the committee on the judiciary describing how the failure to adequately compensate plaintiffs has a chilling effect on the 'pri-

5. The fact that NIBCO has pledged not to use the plaintiffs' immigration status to retaliate against them does not eliminate the substantial risk of chilling the rights of these and future plaintiffs. First, to overturn the magistrate judge's protective order in this case might effectively grant all future employers the right to discover the immigration status of any of their employees who choose to assert a Title VII national origin claim. Second, courts often fashion protective orders designed to protect against anticipated retaliation. In this circuit, for instance, we have held that the existence of post hoc legal reme-

dies for retaliation do not necessarily provide adequate protection when plaintiffs anticipate retaliation that would result in extraordinarily burdensome consequences. *See Advanced Textile Corp.*, 214 F.3d at 1071–72 (noting that "complaining employees are more effectively protected from retaliation by concealing their identities" than by relying on legal anti-retaliation remedies).

6. Title VII even allows the court, in some circumstances, to appoint counsel for the complainant. 42 U.S.C. § 2000a–3(a).

vate attorneys general' policy of the civil rights laws).[7] Given Title VII's dependence on private enforcement, we find that the national effort to eradicate discrimination in the workplace would be hampered by the discovery practices NIBCO seeks to validate here. We therefore conclude that discovery of each plaintiff's immigration status constitutes a substantial burden, both on the plaintiffs themselves and on the public interest in enforcing Title VII and FEHA.

### B. Balancing of Interests

■ Even if the discovery would burden plaintiffs and others with an interest in enforcing Title VII and FEHA, the burden must be "undue" in order to justify the protective order. *See* FED. R. CIV. P. 26(c). We thus must examine NIBCO's various interests in discovering the immigration status information. NIBCO asserts that because each plaintiff's immigration status governs her entitlement to reinstatement, front pay, and back pay on Title VII claim, and governs any recovery on her FEHA claim, it must be permitted to discover this information. We consider NIBCO's contentions below.

### 1. The Relevance of Hoffman Plastic

NIBCO's principal argument is that the Supreme Court's decision in *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002), forecloses any award of backpay to an undocumented plaintiff and therefore discovery of documented or undocumented

status is essential to its defense.[8] We disagree.

In *Hoffman*, the Supreme Court reviewed an award of backpay to illegal immigrants who, in violation of § 8(a)(3) of the National Labor Relations Act ("NLRA"), were terminated because of their participation in the organization of a union. 535 U.S. at 140–41, 122 S.Ct. 1275. The National Labor Relations Board ("NLRB") based its decision to award backpay on its previous holding that the NLRA's protections applied to documented and undocumented workers alike. *Id.* at 141, 122 S.Ct. 1275. The Supreme Court reversed the Board's order. The precise question before the Court was whether the NLRB had the authority under the NLRA to award backpay to undocumented workers notwithstanding the prohibition on hiring such workers in the Immigration Reform and Control Act of 1986 ("IRCA"). Answering that question in the negative, the majority also strongly suggested that the policy goals of IRCA outweigh those of the NLRA, and therefore that IRCA would preclude any backpay award to illegal immigrants under the NLRA. *Id.* at 148–52, 122 S.Ct. 1275.

NIBCO would have us go further and hold that: (a) *Hoffman* precludes any award of backpay to an illegal immigrant, no matter what federal statute the employer may have violated; and (b) the district court is *required* to grant the request for pre-trial discovery of the plaintiffs' immigration status.

---

**7.** FEHA also depends on private enforcement to effectuate its goals. *See Flannery v. Prentice*, 26 Cal.4th 572, 582–83, 110 Cal.Rptr.2d 809, 28 P.3d 860 (2001) (construing attorneys fees provisions to ensure proper incentives for private enforcement of FEHA).

**8.** After *Hoffman* was decided, the plaintiffs agreed that if their proposed *in camera* proce-

dures were adopted, they would not seek backpay for undocumented aliens. Following the issuance of the protective order that is the subject of this interlocutory appeal, the district court considered, but did not rule on, the proposed procedures, including bifurcation of the trial into liability and remedies phases.

We seriously doubt that *Hoffman* is as broadly applicable as NIBCO contends, and specifically believe it unlikely that it applies in Title VII cases. The NLRA and Title VII are different statutes in numerous respects. Congress gave them distinct remedial schemes and vested their enforcement agencies with different powers. For purposes of this opinion, we note at least three significant differences between the two statutes.

■ First, the NLRA authorizes only certain limited private causes of action, while Title VII depends principally upon private causes of action for enforcement. The NLRA is enforced primarily through actions of the NLRB—private actions are available only in exceptional circumstances. *See NLRB v. United Food & Commercial Workers Union, Local 23, AFL–CIO,* 484 U.S. 112, 118–19, 108 S.Ct. 413, 98 L.Ed.2d 429 (1987); *Karahalios v. Nat'l Fed'n of Fed. Employees, Local 1263,* 489 U.S. 527, 536–37, 109 S.Ct. 1282, 103 L.Ed.2d 539 (1989) (recognizing the exceptional actions for breaches of the duty of fair representation and actions to enforce collective bargaining agreements under § 301); *Bd. of Trade v. SEC,* 883 F.2d 525, 530 (7th Cir.1989).[9] Title VII, by contrast, depends almost entirely upon individual workers—private attorneys general—to achieve the deterrent purposes of the statute. *See N.Y. Gaslight Club,* 447 U.S. at 63, 100 S.Ct. 2024(finding that "Congress has cast the Title VII plaintiff in the role of 'a private attorney general,' vindicating a policy 'of the highest priority' "); *Alexander,* 415 U.S. at 45, 94 S.Ct. 1011(holding that "the private right of action remains an essential means of obtaining judicial enforcement of Title VII" and noting that "the private litigant not only

redresses his own injury but also vindicates the important congressional policy against discriminatory employment practices").

Second, Congress has armed Title VII plaintiffs with remedies designed to punish employers who engage in unlawful discriminatory acts, and to deter future discrimination both by the defendant and by all other employers. Title VII's enforcement regime includes not only traditional remedies for employment law violations, such as backpay, frontpay, and reinstatement, but also full compensatory and punitive damages. 42 U.S.C. § 1981a; *see also Pollard v. E.I. du Pont de Nemours & Co.,* 532 U.S. 843, 851–52, 121 S.Ct. 1946, 150 L.Ed.2d 62 (2001). Congress added the latter types of damages to Title VII in 1991 in order to facilitate the deterrence of discrimination. *See* Civil Rights Act of 1991, § 3, 102 Pub.L. 166; 105 Stat. 1071, 1071("The Congress finds that ... additional remedies under Federal law are needed to deter unlawful harassment and intentional discrimination in the workplace."); *see also Pollard,* 532 U.S. at 852, 121 S.Ct. 1946. This full complement of remedies accords with the longstanding notion that Title VII requires courts to remedy instances of discrimination by sending strong messages to would-be-discriminators. *See Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (holding that, in order to achieve "complete justice," district courts have the obligation to "render a decree which will so far as possible eliminate the discriminatory effects of the past as well as *bar like discrimination in the future* ") (emphasis added) (quotation omitted).

---

**9.** This may explain why the *Hoffman* Court found that the NLRA's "traditional remedies," such as cease and desist orders and contempt proceedings, were "sufficient to ef-

fectuate national labor policy regardless of whether" backpay was available. 535 U.S. at 152, 122 S.Ct. 1275.

Third, under the NLRA, the NLRB may award backpay to workers when it has found that an employer has violated the Act. Under Title VII, a federal court decides whether a statutory violation warrants a backpay award.[10] This difference is significant given that *Hoffman* held that the NLRB possesses only the discretion to "select and fashion remedies for violations of the NLRA," and that this discretion, "though broad, is not unlimited." 535 U.S. at 142–43, 122 S.Ct. 1275 (citations omitted). The Court held that, given the strong policies underlying IRCA and the Board's limited power to construe statutes outside of its authority, the NLRB's construction of the NLRA was impermissible.[11] This limitation on the Board's authority says nothing regarding a *federal court's power* to balance IRCA against *Title VII* if the two statutes conflict. A district court has the very authority to interpret both Title VII and IRCA that the NLRB lacks. Thus, to the extent that *Hoffman* stands for a limitation on the NLRB's remedial discretion to interpret statutes other than the NLRA, the decision appears not to be relevant to a Title VII action. *Cf. Smith v. Nat'l Steel*

*& Shipbuilding Co.*, 125 F.3d 751, 757 (9th Cir.1997) (holding that district courts have the authority to construe competing statutes even when the NLRB lacks it).

The differences between the two statutes persuade us that *Hoffman* does not resolve the question whether federal courts may award backpay to undocumented workers who have been discharged in violation of Title VII. Resolving the conflicting statutory policies involved in determining whether IRCA bars such awards to employees discriminated against on the basis of their national origin necessitates a different analysis than the Court undertook in *Hoffman.* As we have pointed out, in Title VII Congress has chosen to rely heavily on private actions that result in the imposition of severe remedies, including backpay, in order to deter future discrimination and vindicate national policy of the highest priority. It is far from evident to us that Congress intended to bar the use of one of the most critical of those remedies in the case of undocumented workers who are victims of invidious discrimination. In fact, given the importance of private ac-

---

10. This is not to say that the EEOC plays no role.. To the contrary, Title VII depends upon both action by the EEOC and private enforcement to achieve its goals. *See E.E.O.C. v. Waffle House, Inc.,* 534 U.S. 279, 286, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002). Along these lines, the EEOC has been given broad authority not just to respond to individual instances of discrimination, but to investigate discrimination independently in an effort to eradicate it from the economy. *Cf. id.* at 296 n. 11, 122 S.Ct. 754 (noting that "[w]e have generally been reluctant to approve rules that may jeopardize the EEOC's ability to investigate and select cases from a broad sample of claims" because " 'it is crucial that the Commission's ability to investigate charges of systemic discrimination not be impaired' ") (quoting *EEOC v. Shell Oil Co.,* 466 U.S. 54, 69, 104 S.Ct. 1621, 80 L.Ed.2d 41 (1984)).

11. *See also Hoffman,* 535 U.S. at 149, 122 S.Ct. 1275(holding that "awarding backpay to illegal aliens runs counter to policies underlying IRCA, policies the Board has no authority to enforce or administer," and therefore that "the award lies beyond the bounds of the Board's remedial discretion"); *id.* at 143, 122 S.Ct. 1275 ("the Board has not been commissioned to effectuate the policies of the Labor Relations Act so single-mindedly that it may wholly ignore other and equally important congressional objectives") (quoting *Southern S.S. Co. v. NLRB,* 316 U.S. 31, 47, 62 S.Ct. 886, 86 L.Ed. 1246 (1942)); *id.* ("While the Board's interpretation of the NLRA should be given some deference, the proposition that the Board's interpretation of statutes outside its expertise is likewise to be deferred to is novel") (quoting *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 529 n. 9, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984)).

tions to the enforcement scheme and of backpay to the bringing of private actions, we are strongly inclined to believe that it did not. We are influenced in this view by the Court's statement in *Albemarle Paper*, 422 U.S. at 417–18, 95 S.Ct. 2362, that it "is the reasonably certain prospect of a backpay award that provide(s) the spur or catalyst which causes employers and unions to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges of an unfortunate and ignominious page in this country's history" (internal citation and quotation marks omitted). We are also influenced by our own court's conclusion that Title VII's "central statutory purpose" is "eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *McLean v. Runyon*, 222 F.3d 1150, 1155 (9th Cir.2000) (quoting *Albemarle Paper*, 422 U.S. at 421, 95 S.Ct. 2362). Finally, we find it significant that the courts that have considered *Hoffman* in analogous cases have thus far found it to be inapplicable or distinguishable.[12] In sum, the overriding national policy against discrimination would seem likely to outweigh any bar against the payment of back wages to unlawful immigrants in Title VII cases. Thus, we seriously doubt that *Hoffman* applies in such actions.

We need not decide the *Hoffman* question in this case, however. Regardless whether *Hoffman* applies in Title VII cases, it is clear that it does not *require* a district court to allow the discovery sought here. No backpay award has been authorized in this litigation. Indeed, the plaintiffs have proposed several options for ensuring that, whether or not *Hoffman* applies, no award of backpay is given to any undocumented alien in this proceeding. Thus, the very problem NIBCO has identified may well never arise here.

▮ Perhaps even more important, we have long recognized "the distinction between a violation [of Title VII] and the availability of remedies." *Hashimoto v. Dalton*, 118 F.3d 671, 676 (9th Cir.1997). The fact that a particular defendant's violation of Title VII might be "inconsequential," because the plaintiff in question is not eligible for certain forms of relief, merely "goes to the issue of damages, not liability." *Id.* The information that NIBCO seeks is not relevant to determining

---

**12.** *See Cano v. Mallory Mgmt.*, 195 Misc.2d 666, 760 N.Y.S.2d 816, 818(N.Y.Sup.Ct.2003) (collecting cases and noting that "every case citing *Hoffman* since it was rendered has either distinguished itself from it or has limited it greatly"); *see also De La Rosa v. N. Harvest Furniture*, 210 F.R.D. 237, 238–39 (C.D.Ill. 2002) (reasoning that a federal district court's remedial power under Title VII differs from the NLRB's power under the NLRA, and thus that *Hoffman* was not "dispositive of the issues raised in the motion to compel" discovery of immigration status in a Title VII action); *cf. Escobar v. Spartan Sec. Serv.*, 281 F.Supp.2d 895, 897 (S.D.Tex.2003) (holding that *Hoffman* "did not specifically foreclose all remedies for undocumented workers under either the National Labor Relations Act or other comparable federal labor statutes");

*Flores v. Albertsons, Inc.*, 2002 U.S. Dist. LEXIS 6171, 2002 WL 1163623, *5 (C.D.Cal. Apr.9, 2002) (finding *Hoffman* inapplicable to an FLSA action); *Flores v. Amigon*, 233 F.Supp.2d 462, 464–65 (E.D.N.Y.2002) (holding that *Hoffman* does not bar backpay under the FLSA and granting a protective order barring discovery into the plaintiff's immigration status); *Zeng Liu v. Donna Karan Int'l, Inc.*, 207 F.Supp.2d 191, 192–93 (S.D.N.Y. 2002) (questioning the applicability of *Hoffman* to the FLSA and denying the defendant's request to discover the plaintiff's immigration status due to the danger of "intimidation, the danger of destroying the cause of action, [and the risk that the discovery would] inhibit plaintiffs in pursuing their rights" (internal quotation marks omitted)).

whether it has violated Title VII. *See id.* (quoting *Smith v. Secretary of Navy,* 659 F.2d 1113, 1120 (D.C.Cir.1981) ("The questions of statutory violation and appropriate statutory remedy are conceptually distinct. An illegal act of discrimination—whether based on race or some other factor such as a motive of reprisal—is a wrong in itself under Title VII, regardless of whether that wrong would warrant an award of [remedies].") (alterations from *Hashimoto* )). We recognize that discovering the various plaintiffs' eligibility for particular remedies would aid the defendant in making pre-trial estimates of the damage award for which it might be responsible if found liable. The convenience to NIBCO, however, is substantially outweighed by the harm the discovery would cause the plaintiffs. *See supra* at 1064–65. Moreover, other remedies clearly remain available and liability must be determined in any event. *See, e.g., Farrar v. Hobby,* 506 U.S. 103, 112–14, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) (holding that even an award of nominal damages is sufficient to allow an award of attorney's fees); *Ruffin v. Great Dane Trailers,* 969 F.2d 989, 993 (9th Cir.1992) (holding that a Title VII plaintiff may recover attorney's fees despite not recovering monetary damages when he has prevailed in his request for injunctive relief), *cert. denied,* 507 U.S. 910, 113 S.Ct. 1257, 122 L.Ed.2d 655 (1993).

The district court has not yet ruled on the plaintiffs' proposed bifurcated proceedings. Although we do not order such proceedings here, it is clear that a separation between liability and damages would be consistent with our prior case law and would satisfy the concern that causes of action under Title VII not be dismissed, or lost through intimidation, on account of the existence of particular remedies. The principal question to be decided in the action before us is whether NIBCO violated Title VII. It makes no difference to the resolution of that question whether some of the plaintiffs are ineligible for certain forms of statutory relief. NIBCO's contention that discovery regarding the plaintiffs' immigration status is essential to its defense is therefore without merit.[13] Accordingly, we hold that the district court did not err when it declined to modify the protective order.

### 2. The After–Acquired Evidence Doctrine

NIBCO argues that the "after-acquired evidence" doctrine requires the district court to approve its discovery request.[14] The "after-acquired evidence" doctrine precludes or limits an employee from receiving remedies for wrongful discharge if the employer later "discovers" evidence of wrongdoing that would have led to the employee's termination had the

---

**13.** The EEOC has agreed with our conclusion in its Enforcement Guidelines. The Commission has found that

> The Supreme Court's decision in *Hoffman* in no way calls into question the settled principle that undocumented workers are covered by the federal employment discrimination statutes and that it is as illegal for employers to discriminate against them as it is to discriminate against individuals authorized to work. When enforcing these laws, EEOC will not, on its own initiative, inquire into a worker's immigration status. Nor will EEOC consider an individual's im-

migration status when examining the underlying merits of a charge.

Equal Employment Opportunity Commission, Rescission of Enforcement Guidance on Remedies Available to Undocumented Workers Under Federal Employment Discrimination Laws (June 27, 2003), *available at* http://www.eeoc.gov/policy/docs/undoc-rescind.html.

**14.** To the extent that NIBCO's argument relates to the availability of frontpay and reinstatement, it has been rendered irrelevant as the successor employer is no longer a party to this dispute.

employer known of the misconduct. *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 360–63, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995). As we have explained, "[a]n employer can avoid backpay and other remedies by coming forward with after-acquired evidence of an employee's misconduct, but only if it can prove by a preponderance of the evidence that it would have fired the employee for that misconduct." *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 761 (9th Cir.1996).

■■■ The *McKennon* Court, interpreting the ADEA,[15] balanced the public policy interest in eliminating unlawful discrimination against the equitable principle that an employer should not be held liable for damages when the employee invokes the aid of the court with unclean hands. *Id.* at 361, 115 S.Ct. 879. The Court concluded that, "as a general rule in cases [involving after-acquired evidence of wrongdoing], neither reinstatement nor front pay is an appropriate remedy." *Id.* at 361–62, 115 S.Ct. 879. Further, the Court held that "[o]nce an employer learns about employee wrongdoing that would lead to a legitimate discharge, we cannot require the employer to ignore the information, even if it is acquired during the course of discovery in a suit against the employer and even if the information might have gone undiscovered absent the suit." *Id.* at 362, 115 S.Ct.

879.[16] Yet the after-acquired evidence doctrine's application depends upon context—"[t]he proper boundaries of remedial relief must be addressed by the judicial system in the ordinary course of further decisions, for the factual permutations and the equitable considerations they raise will vary from case to case." *Id.* at 361, 115 S.Ct. 879.[17]

In this case, NIBCO has failed to come forward with any evidence that would justify limiting the plaintiffs' remedies. NIBCO claims, instead, that the court was required to facilitate its discovery of any such evidence by granting its requests to interrogate the former employees regarding their immigration status. We reject NIBCO's claim. *McKennon* does not direct courts to authorize the type of discovery NIBCO seeks to conduct here. Although *McKennon* involved illegal conduct that was "after-acquired" during a deposition, the *McKennon* Court did not hold that depositions could be conducted for the purpose of uncovering illegal actions. Even if we concluded that *McKennon authorizes* district courts to approve such discovery, that would be a far cry from holding that *McKennon requires* a district court to order plaintiffs to submit to intrusive and injurious investigations in order to pursue a civil rights action. Moreover, the *McKennon* Court insisted that the district courts would play a critical role in

---

**15.** Although we have not yet applied the *McKennon* "after-acquired evidence" rule to Title VII, *McKennon* itself makes clear that the rule applies to both Title VII and the ADEA. *See McKennon*, 513 U.S. at 358, 115 S.Ct. 879 ("The ADEA and Title VII share common substantive features and also a common purpose: 'the elimination of discrimination in the workplace.'") (quoting *Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 756, 99 S.Ct. 2066, 60 L.Ed.2d 609 (1979)). *See also O'Day*, 79 F.3d at 760–61(discussing Title VII and the ADEA interchangeably).

**16.** Therefore, the Court determined that backpay should be awarded only from the date of the unlawful discharge to the date the information is discovered. *Id.* Barring backpay entirely, the Court found, would undermine the objectives of the ADEA. *Id.* at 363, 115 S.Ct. 879.

**17.** *See also id.* at 358, 115 S.Ct. 879("It would not accord with [the remedial scheme adopted by the federal civil rights laws] if after-acquired evidence of wrongdoing that would have resulted in termination operates, *in every instance*, to bar all relief for an earlier violation of the Act.") (emphasis added).

*preventing* defendants from using the after-acquired evidence doctrine as a sword rather than as a shield against inappropriate damage awards. "The concern that employers might as a routine matter undertake extensive discovery into an employee's background or performance on the job to resist claims under the Act is not an insubstantial one, but we think the authority of the courts to ... invoke the appropriate provisions of the Federal Rules of Civil Procedure will deter most abuses." *Id.* at 363, 115 S.Ct. 879.

■ District courts need not condone the use of discovery to engage in "fishing expedition[s]." *See, e.g., Exxon Corp. v. Crosby–Mississippi Resources, Ltd.,* 40 F.3d 1474, 1487 (5th Cir.1995). Accordingly, *McKennon* authorizes district courts to invoke the Federal Rules of Civil Procedure when necessary to prevent employers from using the discovery process to engage in wholesale searches for evidence that might serve to limit its damages for its wrongful conduct. The magistrate judge straightforwardly applied these principles in fashioning the protective order. Given the substantial risk of chilling the plaintiffs' rights, and the fact that all parties had already stipulated that the plaintiffs are members of a protected class under Title VII, the district court appropriately used Rule 26(c) to preclude discovery that might otherwise have allowed the employer to evade liability under Title VII.

■ Moreover, we note that before an employer may use "after-acquired evidence," it must meet its burden of showing that, had it been aware of that evidence, it would have forthwith discharged the employee. *See O'Day,* 79 F.3d at 758–59. Regrettably, many employers turn a blind eye to immigration status during the hiring process; their aim is to assemble a workforce that is both cheap to employ and that minimizes their risk of being reported for violations of statutory rights. Therefore, employers have a perverse incentive to ignore immigration laws at the time of hiring but insist upon their enforcement when their employees complain. We have placed the burden of proof squarely on employers who seek to assert an after-acquired evidence defense. *Id.* at 759 ("*McKennon* places the burden of proof with respect to this issue on the employer, carefully articulating that the employer must establish not only that it could have fired an employee for the later-discovered misconduct, but that it would in fact have done so."). Thus, in the immigration context, the employer must prove that it would actually have fired the employees had it known that they were undocumented. It does not appear that there is any evidence in the record, at this stage of the litigation, that would tend to satisfy NIBCO's burden that it would have done so. In this circumstance, a district court may well be reluctant to order discovery that would inquire into the immigrant's status, given the harm that such investigations cause. *See supra* at 1064–65.

We conclude that the after-acquired evidence doctrine did not require the district court to grant NIBCO's discovery request. Defendants may undoubtedly use the discovery process to obtain "relevant" evidence. Yet district courts have the discretion to structure depositions and interrogatories in ways that balance the defendant's need to obtain evidence of possible misconduct relevant only to remedies with the burdens the plaintiffs would face if such discovery took place before trial. Here, the balance the court struck was well within its discretion.

### 3. Plaintiffs' FEHA Claim

There is an additional dispute concerning whether the plaintiffs' immigration sta-

tus is relevant to their FEHA claims. NIBCO relies on two California cases that adopt the reasoning of *McKennon: Murillo v. Rite Stuff Foods, Inc.,* 65 Cal.App.4th 833, 77 Cal.Rptr.2d 12 (1998) and *Camp v. Jeffer, Mangels, Butler, & Marmaro,* 35 Cal.App.4th 620, 41 Cal.Rptr.2d 329 (1995). The *Camp* decision stands for the proposition that an employee who illegally acquires a job may not recover on a claim for wrongful discharge. *See Camp,* 35 Cal. App.4th at 639, 41 Cal.Rptr.2d 329. *Murillo* upheld *Camp* as applied to an undocumented alien by ruling that, though an illegal alien cannot state a claim for wrongful discharge, he may recover for illegal harassment suffered *during* the employment. *See Murillo,* 65 Cal.App.4th at 847–51, 77 Cal.Rptr.2d 12.

Both of these decisions, however, predate the California legislature's response to *Hoffman.* In September 2002, just over five months after *Hoffman* was decided, California enacted a statute codifying identical provisions in three sections of its codes: "All protections, rights, and remedies available under state law, except any reinstatement remedy prohibited by federal law, are available to all individuals regardless of immigration status who have applied for employment, or who are or who have been employed, in this state." CAL. CIV. CODE § 3339(a); CAL. GOV'T CODE § 7 285(a); CAL. LAB. CODE § 1171.5(a). Thus, California appears to have provided for a wide range of monetary remedies including some that may not be available to undocumented workers under Title VII; accordingly, *Camp* and *Murillo* may no longer be good law.

Were the district court to award backpay to plaintiffs found to be illegal immigrants, a conflict might arise between IRCA and California law. However, given our holding that the liability stage may go forward without deciding the question of what remedies are available, there is no need for us to engage in a preemption analysis now. Only in the event that the district court finds NIBCO liable and then decides, after considering its various factual and legal options, to award backpay to illegal immigrants will it become necessary for us to decide the preemption question. *See supra* note 8.

### 4. IRCA's Reverification Provision

Finally, both parties have advanced arguments about the relevance of IRCA to this dispute. The plaintiffs have argued that IRCA prohibits the requested discovery; NIBCO maintains that, after *Hoffman,* IRCA prohibits the protective order. We have discussed NIBCO's contention above. We now turn to the plaintiffs' contention and find it meritless.

 The essence of the plaintiffs' argument is that NIBCO's discovery request violates IRCA's prohibition on "document reverification." *See* 8 U.S.C. § 1324b(a)(6). IRCA generally prohibits employers from requesting "more or different" documents than those specified in the statute when evaluating an individual's immigration status upon hiring, recruiting, or referring them for employment.[18] The Office of the Chief Administrative Hearing Officer ("OCAHO"), in the Executive Office for Immigration Review of the Justice

---

**18.** 8 U.S.C. § 1324b(a)(6) states: "A person's or other entity's request, for the purposes of satisfying the requirements of section 1324a(b) of this title [concerning hiring, recruiting, or referring], for more or different documents than are required under [§ 1324a(b)] or refusing to honor documents tendered that on their face reasonably appear to be genuine shall be treated as an unfair immigration-related employment practice if made for the purpose or with the intent of discriminating against any individual [other than an unprotected undocumented alien on the basis of national origin or citizenship status.]"

Department, has interpreted the relevant provision to require plaintiffs to establish "(1) that the [defendant] is a person or other entity which makes a request; (2) for more or different documents than are required by the employment verification system; and (3) that the request was made for purposes of complying with the provisions of 8 U.S.C. § 1324a(b)." *United States v. Townsend Culinary*, 8 OCAHO 1032, 1999 WL 1295209, *33 (1999). This court also requires that the plaintiff prove that the employer had a discriminatory intent. *Robison Fruit Ranch, Inc. v. United States*, 147 F.3d 798, 801–02 (9th Cir.1998).

Nothing in the text, structure, or legislative history of IRCA suggests that the "reverification" provision regulates the discovery process. Rather, the provision concerns the documents that an employer may request when fulfilling its mandatory duty to investigate immigration status upon hiring, recruiting, or referring new employees. *See* 8 U.S.C. §§ 1324a(b), 1324b(a)(6). What documents an employer may investigate in the context of a lawsuit is beyond the scope of the cited IRCA provisions.

Nevertheless, we agree with the district court that the magistrate judge did not rely on IRCA to justify its protective order. That the protective order comports with one of the *purposes* of IRCA's reverification provision—to prevent employers from intimidating workers from exercising their rights by repeatedly raising the specter of deportation—does not mean that the protective order *depended upon* IRCA for legal support. The district court rightly considered the threat of intimidation and retaliation when assessing the burden the discovery would place on the plaintiffs. We find that while IRCA does not require the protective order the magistrate judge issued, neither does the Act show that the protective order was "contrary to law."

## IV. Conclusion

We hold that the district court properly exercised its discretion in concluding that NIBCO's proposed discovery placed an "undue burden" on the plaintiffs.[19] The court did not err in determining that it would substantially burden the plaintiffs to allow the defendant to use the discovery process to inquire into their immigration status—a status that NIBCO had the opportunity to examine upon hiring and that is irrelevant to the question of liability. We seriously doubt that *Hoffman's* prohibition of NLRB-authorized backpay awards under the NLRA serves to prohibit a district court from awarding backpay to a Title VII plaintiff. But even if we were to conclude that *Hoffman* did preclude backpay awards to illegal immi-

19. We differ with our concurring colleague in only minor respects. We do not agree that it might be "more efficient," post at 1075, to allow NIBCO to question the plaintiffs concerning their immigration status during the liability phase of the trial. Indeed, in our view, such questioning might be profoundly inefficient if, as seems likely to us, it might serve to discourage legal and illegal immigrants alike from pursuing their potentially valid legal claims not only in this case, but in future cases as well. Moreover, we do not believe it correct to state that the district court may allow NIBCO to inquire into the information now protected once "liability has been ascertained." *See* post, at 1075.

Whether it would be proper for such discovery to proceed depends on the outcome of two issues about which there is considerable doubt. First, although we have left open the question whether *Hoffman* applies in a Title VII action, we emphasize that we have serious reservations about its applicability. Second, as for *McKennon*, the record does not indicate whether NIBCO would be able to satisfy its burden of proof under *O'Day*, 79 F.3d at 758–59. Only if NIBCO came forward with persuasive evidence regarding its practices and policies would it be appropriate for it to inquire into the plaintiffs' immigration status under the after-acquired evidence doctrine.

grants under all federal statutes, it would not matter in this case. *Hoffman* does not make immigration status relevant to the determination whether a defendant has committed national origin discrimination under Title VII. If the district court decides to bifurcate the proceeding, as the plaintiffs have requested, the availability of backpay remedies for certain plaintiffs will be determined, if at all, only after the liability phase. Similarly, neither IRCA nor the after-acquired evidence doctrine requires the district court to allow NIBCO's requested discovery. It was neither erroneous nor contrary to law for the district court to protect the plaintiffs, and the public interest, from being unduly burdened by issuing the protective order.

We AFFIRM the decision of the district court and REMAND for further proceedings consistent with this opinion.

SILER, Circuit Judge, concurring:

I write separately in concurring because I would affirm the ruling of the magistrate judge in denying discovery as not being clearly erroneous or contrary to law, as stated in the majority opinion. Had the magistrate judge ruled to the contrary, that is, denied a protective order, I might very well affirm any appeal by the plaintiffs for a denial of the protective order on the same basis, that is, the ruling was not clearly erroneous or contrary to law.

If the district court decides to bifurcate the trial on the issues of liability and damages, the documented status of the plaintiffs would not likely be relevant in the first part of the trial. It might be more efficient if the district court allowed NIBCO to question the plaintiffs concerning their documented status during the liability phase, because the information might give rise to motions for summary judgment early in the proceedings. However, we are not here to rule on the efficiency of the district courts in moving cases through their dockets.

It appears to me, as the majority admits, that it is arguable that either *Hoffman Plastic Compounds, Inc. v. NLRB,* 535 U.S. 137, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002); or *McKennon v. Nashville Banner Publ'g Co.,* 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995), would preclude the award of damages, at least in part, for an undocumented worker. The applicability of either of those decisions, however, would be up to this court in a direct appeal from any damage award. Therefore, the district court may later in its proceedings after liability has been ascertained allow NIBCO to inquire into these matters that are now protected.

I emphasize that this is an interlocutory appeal, not on the merits of this case. Unless this case is resolved by settlement, it will be up to this court to resolve many of these issues on direct appeal later.