384 F.3d 822
 Martha RIVERA; Mao Her; Alicia Alvarez; Eva Ariola; Peuang Bounnhong; Rosa Ceja; Chhom Chan; Bee Lee; Paula Martinez; Maria Domitilia Medina; Mai Meemoua; Margarita Mendoza; Bao Nhia Moua; Isidra Murillo; Maria Navarro; Vath Rattanatay; Ofelia Rivera; Sara Rivera; Maria Rodriguez; Maria Ruiz; Maria Valdivia; Sy Vang; Youa Xiong; See Yang; Xhue Yang, Plaintiffs-Appellees,
v.
NIBCO, INC., an Indiana corporation, Defendant-Appellant.
 No. 02-16532.
 United States Court of Appeals, Ninth Circuit.
 Filed September 20, 2004.
 
 Christopher Ho, Esq., The Legal Aid Society/Employment Law Center, San Francisco, CA, for Plaintiffs-Appellees.
 William C. Hahesy, Esq., Sara Hedgpeth-Harris, Esq., Sagaser Franson & Jones, Fresno, CA, for Defendant-Appellant.
 Amy Sugimori, Esq., New York, NY, Rebecca Smith, Esq., Olympia, WA, for Amicus, National Employment Law Project.
 Brendan D. Cummins, Esq., Miller-O'Brien, P.L.L.P., Minneapolis, MN, for Amicus, The National Employment Lawyers Association ("NELA").
 Before REINHARDT, SILER, JR.,* and HAWKINS, Circuit Judges.
 
 
 1
 BEA, Circuit Judge, with whom Circuit Judges KOZINSKI, KLEINFELD and GOULD join, dissenting from the denial of rehearing en banc:
 
 ORDER
 
 2
 Judges Reinhardt, Siler and Hawkins voted to deny the petition for rehearing. Judges Reinhardt and Hawkins voted to deny the petition for rehearing en banc and Judge Siler so recommended.
 
 
 3
 The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc reconsideration. Fed. R. App. P. 35.
 
 
 4
 The petitions for rehearing and rehearing en banc are denied.
 
 
 5
 BEA, Circuit Judge, with whom Circuit Judges KOZINSKI, KLEINFELD and GOULD join, dissenting from the denial of rehearing en banc:
 
 
 6
 The panel's decision allows a plaintiff who claims that racially discriminatory firing caused backpay and frontpay lost wages, to refuse to answer deposition questions touching on her place of birth and immigration status.
 
 
 7
 Thus, the panel's decision impedes the ascertainment of the truth in advance of trial, thereby profoundly subverting the purposes of liberal Discovery in civil cases. The decision also frustrates the purposes of national Immigration policy: to limit employment benefits to American citizens and foreign persons authorized to work in this country.
 
 
 8
 It may be tempting to increase the settlement value or the award of a minority worker's racial discrimination lawsuit by allowing her to include claimed lost wages and bar questioning of her immigration status. After all, the employer hired her and benefited from her labor. While she was working, the employer did not dig too deep into whether her papers were in order. Now that she asserts her civil rights against the employer's claimed discriminatory firing, the employer gets righteous, and for all the wrong reasons.
 
 
 9
 If estoppel by the employer's acts could bar enforcement of our country's Immigration laws, the panel's opinion might not be so objectionable. Of course, we know such private conduct cannot frustrate explicitly stated congressional public policy. See Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. 137, 151-52, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002) (holding that plaintiffs, who were unauthorized aliens, were not entitled to backpay as a remedy for violation of the NLRA because such remedy would "unduly trench upon" federal immigration policy expressed in the IRCA).
 
 
 10
 We risk corrupting an admirable civil rights policy to prevent discrimination when we rely on evasions to enforce it. Further, such evasions are not necessary to enforce that policy were the plaintiffs forthrightly to waive only one of their money claims, the one based on a possibly illegal contract, while retaining other money, equitable and counsel fees' claims.
 
 
 11
 The fact is that if plaintiffs do not have authorized immigration status, they are not entitled to be awarded back wages or wages they might have earned in the future from a job which they were incapable of holding, under our Immigration laws. See Hoffman Plastic, 535 U.S. at 151-52, 122 S.Ct. 1275.
 
 
 12
 To justify evading this obvious fact, the panel generates a fog of half-convincing procedural distractions, all of which disappear when examined under the light of principled reasoning and authorities.
 
 
 13
 1. The standard of review dictates the result?
 
 
 14
 Arguing the district court's decision affirming the Magistrate's order is "only" a Discovery order, and decides none of the merits, the panel seems to be deciding only a preliminary matter which, if wrong, can later be dealt with by the same trial court sometime before trial, or in trial.
 
 
 15
 This is precisely against the view of this court that the broad right of discovery is "based on the general principle that litigants have a right to `every man's evidence,' and that wide access to relevant facts serves the integrity and fairness of the judicial process by promoting the search for the truth." Shoen v. Shoen, 5 F.3d 1289, 1292 (9th Cir.1993) (internal quotation marks and citations omitted).
 
 
 16
 Since the adoption of the Federal Rules of Civil Procedure in 1938, the courts have consistently held that Discovery was to serve as a device to clarify the basic issues between the parties. See Hickman v. Taylor, 329 U.S. 495, 501, 67 S.Ct. 385, 91 L.Ed. 451 (1947) ("[t]he various instruments of discovery now serve (1) as a device, along with the pre-trial hearing under Rule 16, to narrow and clarify the basic issues between the parties, and (2) as a device for ascertaining the facts, or information as to the existence or whereabouts of facts, relative to those issues").
 
 
 17
 Further, pre-trial discovery has been recognized as an essential means for evaluation of damages, so that settlements can be achieved. See United States v. Meyer, 398 F.2d 66, 71 (9th Cir.1968) (noting that encouraging settlements is a basic purpose of pre-trial discovery).
 
 
 18
 Absent bifurcation or phasing of issues by case management procedures,[1] there simply is no principled reason for delaying frank investigation of the nature and extent of damages, unless it is a desire to advantage the plaintiffs, at least temporarily, and for the purposes of driving a higher settlement. Tellingly, the district court did not indicate that it was premature to consider discovery into wage loss claims.
 
 
 19
 The panel's decision could be read merely as an affirmance of the trial court's exercise of discretion in case management "[a]t this early stage in the litigation." Rivera, 364 F.3d at 1064. If that is what the panel meant, it was wrong. The use of "early stage" is merely a characterization of an abstraction to avoid the facts of this case. What is likely, or even possible, to change as to the wage loss claim in the course of the litigation? Plaintiffs either did or did not suffer wage loss, depending on whether they had a legal right to hold their jobs. When is it "too soon" to ask a plaintiff claiming damages questions of fact as to whether she was and is legally entitled to those damages?[2]
 
 
 20
 Another abstraction presented, but unexamined, by the panel is the concept the district court engaged in: a "balancing of hardships," a basis of decision to which much discretion is given. See Rivera, 204 F.R.D. 647, 649 (E.D.Cal.2001). Let us then examine the hardships:
 
 
 21
 a. Plaintiffs' hardships.
 
 
 22
 If forced to answer birthplace and immigration status questions, plaintiffs will suffer the hardships of (a) possibly admitting lack of American citizenship or visa status permitting work and thereby lose the right to recover wage losses, past and future, and (b) risk providing evidence of lack of authorized alien status to the authorities, leading to possible removal from the United States.
 
 
 23
 Both of these "hardships" are merely threats to end plaintiffs' enjoying benefits to which they are not entitled under the law.
 
 
 24
 b. Defendant's hardships.
 
 
 25
 Defendant will have to prepare for trial or enter into settlement negotiations without essential proof to defend against the claims for wage loss, past and future, as well as foundational evidence (place of birth) for actuarial projections for the possible extent of non-economic damages (duration of emotional distress).
 
 
 26
 Both of these hardships are deprivations of rights heretofore guaranteed to the defendant by the Federal Rules of Civil Procedure (Rule 26 et seq.) for preparation of its defense at trial.
 
 
 27
 Hence, the "balancing of the hardships" involves the preservation of illegal benefits (to plaintiffs) versus the vindication of trial preparation rights granted to all litigants (defendant).
 
 
 28
 I respectfully submit that when viewed in the facts of this case, rather than as an airy abstraction, the "balance of hardships" makes the district court ruling for the plaintiff "clearly erroneous or contrary to law." Where, as here, a district court's discovery order is "clearly erroneous or contrary to law," the function of this court is not to ignore it, but to correct it. See Fed. R. Civ. P. 72(a); see also Osband v. Woodford, 290 F.3d 1036, 1041 (9th Cir.2002).
 
 
 29
 2. Plaintiffs' place of birth is irrelevant to the issues?
 
 
 30
 The basis of the panel's decision was solely that discovery as to the plaintiffs' place of birth is irrelevant; and that discovery as to their immigration status would have a "chilling effect" on the plaintiffs' exercise of their civil rights. See Rivera, 364 F.3d at 1062, 1064. Let us first examine the "irrelevancy" of plaintiffs' place of birth.
 
 
 31
 This determination is so clearly wrong, the panel's decision shies from touching it. First, the protective order prohibits questioning into plaintiffs' place of birth on the grounds that place of birth was "not relevant" to plaintiffs' claims. Rivera v. NIBCO, Inc., 204 F.R.D. 647, 649 (E.D.Cal.2001) ("[t]here appears to be no dispute that each plaintiff is a member of a protected class, and further questions regarding where each plaintiff was born has no relevance to this action"). That ruling is clearly incorrect and demonstrates ignorance of issues of damages common to trials. Plaintiffs' place of birth is relevant insofar as longevity is the multiplicand in the computation of frontpay damages; it is also relevant to the calculation of the duration of emotional distress damages. For example, a woman born in the U.S. has a life expectancy of 80.05 years; while a woman born in Mexico has a life expectancy of 75.49 years. See CIA World Factbook, 2004. As any trial lawyer knows, the longer the life expectancy, the higher the economic and non-economic damages claims which can be presented to the jury on the "blackboard" in final argument.
 
 
 32
 It will not do to say the relevance of this issue is only marginal and that the trial court was in the best position to judge its relevancy against the harm it might produce and that we should accord discretion to its relevancy ruling. The record plainly shows the trial court — and indeed this panel — never considered nor weighed the significance of this life expectancy evidence as a factor in computation of damages.
 
 
 33
 3. Plaintiffs' immigration status need not be revealed?
 
 
 34
 Plaintiffs' immigration status is relevant in two respects: (1) under the Supreme Court's decision in Hoffman, unauthorized aliens are not entitled to backpay and frontpay damages under Title VII[3] and (2) under the after-acquired evidence doctrine, plaintiffs are precluded from recovering backpay and frontpay damages for discrimination under Title VII, once an employer discovers that plaintiffs are unauthorized aliens, if the employer proves that upon discovery of the unauthorized alien status, the employer would have complied with the law and terminated the employee's employment.[4] Indeed, the magistrate judge acknowledged that plaintiffs' immigration status was relevant to the litigation, but nonetheless issued a protective order prohibiting questioning into plaintiffs' immigration status on the ground that allowing defendant to so inquire would "unnecessarily chill legitimate claims of undocumented workers under Title VII." Rivera, 364 F.3d at 1062; see also Rivera, 204 F.R.D. at 649. Accordingly, the magistrate judge "barred all discovery" into plaintiffs' immigration status, but inexplicably "did not preclude NIBCO from conducting its own investigation." Rivera, 364 F.3d at 1062. It is contradictory to say that NIBCO can continue to investigate plaintiffs' immigrant status — which it could use to "rat out" the plaintiffs to the immigration authorities — but cannot ask plaintiffs that question on deposition. The magistrate judge's order is an incomplete remedy inasmuch as it is not accompanied by an in limine order precluding defendant from introducing such evidence at trial.[5] By granting the protective order, the district court improperly denied defendant access to relevant information and thwarted the settlement purpose of discovery.
 
 
 35
 4. Plaintiff's exercise of her civil rights will be affected by the "chilling effect" of pre-trial discovery of her immigration status?
 
 
 36
 The federal rules provide for limitations on discovery in order to protect a person or party from "annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c). "If a court finds particularized harm will result from disclosure of information to the public, then it balances the public and private interests to decide whether a protective order is necessary." Rivera, 364 F.3d at 1063-64(quoting Phillips ex rel. Estates of Byrd v. General Motors Corp., 307 F.3d 1206, 1210-11 (9th Cir.2002)).
 
 
 37
 In general, the party seeking a protective order for discovery materials must demonstrate that "good cause" exists for the protection of that evidence. "Good cause" is established where it is specifically demonstrated that disclosure will cause a "specific prejudice or harm." Phillips, 307 F.3d at 1211-12. Courts have held that the showing of "good cause" under Rule 26 is a heavy burden. See Blankenship v. Hearst Corp., 519 F.2d 418 (9th Cir.1975). "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." Phillips, 307 F.3d at 1211-12 (citing Beckman Indus., Inc. v. Int'l Ins. Co., 966 F.2d 470, 476 (9th Cir.1992)).[6]
 
 
 38
 In the instant case, in upholding the validity of the protective order, the panel concludes — in little more than an ipse dixit — that disclosure of plaintiffs' immigration status would have a "chilling effect" on plaintiffs' willingness to assert their statutory rights and that this "chilling effect" outweighs defendant's interest in obtaining such evidence. Indeed, the panel notes repeatedly that allowing employers to inquire into plaintiffs' immigration status would have a "chilling effect" on plaintiffs' willingness to seek redress for violations of their workplace rights. See Rivera, 364 F.3d at 1061, 1062, 1064-65, 1065 n. 5, 1072(nine references to "chill" or "chilling effect").[7] This argument is a shibboleth. While it may be a polemical argument appealing to some, the panel points to no evidence to substantiate its conclusion that anyone in this lawsuit would be so "chilled." Under the law, evidence, not speculation, is required. See King v. Conde, 121 F.R.D. 180, 193 (E.D.N.Y.1988) (balancing interests and denying police officers a protective order where officers failed to produce evidence of "chilling effect" on officer's candor in civil rights cases; court concluded "there is no empirical evidence of which this court is aware supporting the `chilling' contention").
 
 
 39
 Perhaps the lack of evidence here should not be surprising, given that the panel's ipse dixit hunch is wrong. "Unchilled" but unauthorized aliens are not only entitled to, but have sought emotional distress damages, punitive damages, and attorneys' fees under Title VII and the California Fair Employment Housing Act and have, in fact, sought to vindicate their workplace rights. I point to 17 "unchilled" plaintiffs, represented by San Francisco's La Raza Centro Legal and pro bono attorneys who brought suit in Aguilar v. Avis Rent-A-Car System, Inc., 45 Cal.App.4th 933, 973, 53 Cal.Rptr.2d 599 (1996), aff'd, 21 Cal.4th 121, 87 Cal.Rptr.2d 132, 980 P.2d 846 (1999), cert. denied, 529 U.S. 1138, 120 S.Ct. 2029, 146 L.Ed.2d 971 (May 22, 2000) (Thomas, J., dissenting).[8] Hispanic plaintiffs, without proof of immigration status, recovered emotional distress damages and attorneys' fees. See Aguilar (awarding emotional distress damages and attorneys' fees to Hispanic employees who brought suit for employment discrimination under FEHA, the California analogue to Title VII).
 
 
 40
 The panel instead asserts that "the caselaw substantiates" the panel's fear that plaintiffs will be "chilled." In support of its assertion, the panel cites cases in which employees claimed to have been retaliated against when they sued their employer for violations of civil rights and labor laws. See Rivera, 364 F.3d at 1064. First, plaintiffs clearly did bring claims in those cases, regardless of the asserted "chilling effect." Second, that unauthorized aliens fear the legal consequences of breaking the law ought not prevent defendants from proving that plaintiffs are not entitled to certain forms of relief.[9]
 
 
 41
 Moreover, the panel notes that the Ninth Circuit had awarded backpay and frontpay to unauthorized aliens before Hoffman. See Rivera, 364 F.3d at 1064 & n. 4. Rather than any evidence that unauthorized workers were "chilled" in the exercise of their civil rights, we have evidence they were not "chilled" from vindicating their rights under Title VII. See EEOC v. Hacienda Hotel, 881 F.2d 1504 (9th Cir.1989) (awarding backpay to five unauthorized aliens in a Title VII action) and Rios v. Enterprise Ass'n Steamfitters Local Union 638, 860 F.2d 1168 (2d Cir.1988) (six unauthorized aliens sought backpay under Title VII). See also Patel v. Quality Inn South, 846 F.2d 700, 705 (11th Cir.1988) (unauthorized alien sought backpay under Fair Labor Standards Act); Local 512, Warehouse and Office Workers' Union v. NLRB, 795 F.2d 705, 718 (9th Cir.1986) (unauthorized aliens entitled to backpay for employers' violations of the FLSA), overruled by Hoffman Plastic; Alvarez v. Sanchez, 105 A.D.2d 1114, 482 N.Y.S.2d 184(4th Dep't 1984) (unauthorized alien sued for backpay for employer's violation of the FLSA); Lopez v. Superflex, Ltd., 2002 WL 1941484, *2 (S.D.N.Y. Aug.21, 2002) (unauthorized alien sued for backpay for employer's violation of the ADA and New York State Human Rights Law).
 
 
 42
 Against this phalanx of unauthorized alien plaintiffs and Governmental institutions (EEOC, California Department of Fair Employment and Housing, etc.), which have acted to vindicate anti-discrimination-in-employment rights, where in the panel opinion is the citation of any evidence of the claimed "chilling effect"? Where is the affidavit of a frustrated "Doe" claimant who claims he was "chilled" into lamb-like acceptance of civil rights violations? Where is the affidavit of the sociological expert witness, a fixture of civil rights litigation for 50 years, attesting to the psychological fear which prevents litigation? Where is the affidavit of a field investigator to show that dozens of wronged plaintiffs are cowering in fear of detection should they approach the courthouse?
 
 
 43
 Dare it be mentioned? Where is the affidavit of an attorney for an activist organization who, whilst keeping the names of the "chilled" confidential, tells us of the cases he has not been able to bring because of the "chilling effect" that such potential clients would be informed upon by vengeful employer defendants?
 
 
 44
 Moreover, the panel argues that employers will use plaintiffs' immigration status to "rat out" the plaintiff to the U.S. Immigration and Customs Enforcement Bureau.[10] But isn't this exactly what a good citizen should do: denounce a crime which has been committed? Apparently, what the panel wants the employer to do is to keep it quiet if it learns of the felony.[11] As a general rule, a citizen has no duty to denounce a crime he has seen committed, but if he knows that a crime has been committed (i.e., an unauthorized alien has been employed) and keeps quiet about it, he may also be committing one or more felonies. See 18 U.S.C. § 4(prohibiting "misprision of a felony"); see also 8 U.S.C. § 1324(a)(1)(A)(iii) (making it a crime to shield unauthorized aliens from detection); United States v. Cantu, 557 F.2d 1173, 1180 (5th Cir.1977) (affirming prosecution of employer under 8 U.S.C. § 1324(a)(1)(A)(iii)).
 
 
 45
 5. Hoffman Plastics Compound, Inc. v. NLRB does not stand for the proposition that unauthorized aliens are not entitled to Backpay, Reinstatement or Frontpay under Title VII?
 
 
 46
 In Hoffman Plastic, the U.S. Supreme Court held that unauthorized aliens who sued their employer for engaging in unfair labor practices in violation of the National Labor Relations Act, 49 Stat. 449, as amended, 29 U.S.C. §§ 151 et seq. ("NLRA" or the "Wagner Act" of 1935) were not entitled to an award of backpay because of their immigration status as unauthorized aliens.
 
 
 47
 In so holding, the court reasoned that federal immigration policy, as codified by the Immigration Reform and Control Act of 1986 ("IRCA"), foreclosed such an award. In particular, under IRCA, it is a crime for an unauthorized alien to tender fraudulent documents in order to procure work. 8 U.S.C. § 1324c(a). Moreover, if an employer unknowingly hires an unauthorized alien, the employer must discharge the worker upon discovery of the worker's unauthorized status. 8 U.S.C. § 1324a(a)(2). Employers who know of the worker's unauthorized status and fail to discharge such worker are subject to civil fines and may be subject to criminal prosecution. 8 U.S.C. § 1324a(e)(4)(A). It is no defense to IRCA that at the original hiring, the employee presented an apparently valid Social Security card, if the employer now knows he is an unauthorized alien. The court in Hoffman reasoned that it could not award backpay to unauthorized aliens without contravening IRCA. The court concluded that:
 
 
 48
 [a]llowing the Board to award backpay to illegal aliens would unduly trench upon explicit statutory prohibitions critical to federal immigration policy, as expressed in IRCA. It would encourage the successful evasion of apprehension by immigration authorities, condone prior violations of the immigration laws, and encourage future violations.
 
 
 49
 Hoffman, 535 U.S. at 151-52, 122 S.Ct. 1275.
 
 
 50
 In the instant case, in concluding that the court can grant to unauthorized aliens suing under Title VII the remedies of backpay, frontpay and reinstatement, the panel argues that Hoffman does not preclude such an award. In so holding, the panel would limit the Hoffman decision to preclude an award of backpay to unauthorized aliens suing under the NLRA and not under Title VII. See Rivera, 364 F.3d at 1064-66. The panel wrote:
 
 
 51
 [t]he precise question before the Court [in Hoffman] was whether the NLRB had the authority under the NLRA to award backpay to undocumented workers notwithstanding the prohibition on hiring such workers in the Immigration Reform and Control Act of 1986 ("IRCA"). Answering that question in the negative, the majority also strongly suggested that the policy goals of IRCA outweigh those of the NLRA, and therefore that IRCA would preclude any backpay award to illegal immigrants under the NLRA.
 
 
 52
 * * *
 
 
 53
 We seriously doubt that Hoffman is as broadly applicable as NIBCO contends, and specifically believe it unlikely that it applies in Title VII cases.
 
 
 54
 Rivera, 364 F.3d at 1066-67.
 
 
 55
 The panel reaches this conclusion by arguing that the significant differences between Title VII and the NLRA compel a conclusion that "Hoffman does not resolve the question whether federal courts may award backpay to undocumented workers who have been discharged in violation of Title VII."[12] Rivera, 364 F.3d at 1058. The panel argues that the NLRA has a narrower purpose than Title VII. In support of this contention, the panel first argues that the NLRA's purpose is to grant remedies for unfair labor practices by administrative means, not court action.
 
 
 56
 By contrast, Title VII actions are enforced primarily by means of private actions.[13] Second, the panel argues that Title VII provides for broader remedies than does the NLRA. Specifically, the NLRA provides for backpay, frontpay and reinstatement, while Title VII allows for compensatory and punitive damages as well as backpay, frontpay and reinstatement. Third, the NLRB is only empowered to award backpay when it has found that an employer has engaged in an unfair labor practice. Under Title VII, a federal court determines whether a civil right violation merits an award of backpay. In the panel's view, "this difference is significant" in light of the reasoning in Hoffman that "given the strong policies underlying IRCA and the Board's limited power to construe statutes outside of its authority, the NLRB's construction of the NLRA was impermissible." Rivera, 364 F.3d at 1068. That is, the Hoffman decision was predicated upon the fact that the NLRB had limited authority and therefore could not weigh competing federal interests, whereas the federal courts do in fact have such authority when construing Title VII. Accordingly, the panel proceeds to weigh the "competing federal interests" at issue here and concludes that "the overriding national policy against discrimination would seem likely to outweigh any bar against the payment of back wages to unlawful immigrants in Title VII cases." Rivera, 364 F.3d at 1069.
 
 
 57
 This is not logical. First, the district court in Rivera was not called upon to weigh the "policy considerations" of Title VII versus the "policy considerations" of the IRCA, something which the panel opinion determines the NLRB was not "expert" enough to do. The only issue for the district court in Rivera was to determine what damage remedies Title VII provides.[14] Under Title VII, a prevailing party may obtain backpay, reinstatement (or frontpay for those electing not to be reinstated), as well as compensatory and punitive damages. See Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 851-52, 121 S.Ct. 1946, 150 L.Ed.2d 62 (2001) (noting that remedies available under Title VII are backpay, frontpay, reinstatement, compensatory and punitive damages); Faragher v. City of Boca Raton, 524 U.S. 775, 804, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (same).[15]
 
 
 58
 Under Title VII, backpay and frontpay or reinstatement are provided as remedies if and only if the alleged discrimination caused the plaintiff damage. Congress has already determined that vindication of the employee's civil rights require backpay and frontpay or reinstatement. See 42 U.S.C. § 2000e-5(g); Albemarle Paper Co. v. Moody, 422 U.S. 405, 450, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (noting that Congress gave courts ability to award backpay in title VII cases to "eliminate, as far as possible, the last vestiges" of discrimination).
 
 
 59
 However, courts will award a damage remedy under Title VII only where the plaintiff has proven he actually suffered the claimed loss. Indeed, since there is a statutory duty to mitigate damages, courts have held that a precondition for a claim for backpay and reinstatement or frontpay under Title VII is that the plaintiff be in all manner ready, willing and legally capable of performing alternate work at the commencement and through the backpay period. See Ackerman v. Board of Educ., 387 F.Supp. 76, 81 (S.D.N.Y.1974) ("[i]n order to establish eligibility for an award of backpay under equal opportunities law, a claimant must prove as a first step ... that he was ready, willing and able to work"; plaintiff suing under Title VII not entitled to backpay where he could not show that he applied for teaching position at a number of public schools). See also U.S. v. Wood, Wire and Metal Lathers, Int'l. Union Local 46, 328 F.Supp. 429, 443(S.D.N.Y.1971) (plaintiffs entitled to backpay where they could prove that they mitigated damages by working on alternate jobs). Moreover, physical inability to work bars a backpay claim. See EEOC v. Indep. Stave, 754 F.Supp. 713, 721(E.D.Mo.1991) (holding that plaintiff could not recover backpay where physical injury prevented her from working at alternate job for purposes of mitigating damages); Martin v. Dep't of Air Force, 184 F.3d 1366, 1367-68 (Fed.Cir.1999) (plaintiff not entitled to backpay for period of time he was physically unable do physical tasks required by his work). Similarly, voluntary removal from the labor market removes backpay claim. See Miller v. Marsh, 766 F.2d 490 (11th Cir.1985) (plaintiff who removed herself from labor market by attending law school not entitled to backpay); Stevens v. Tennessee Valley Authority, 805 F.2d 1036, 1986 WL 18134, *6 (6th Cir.1986) (plaintiff not entitled to backpay where he was unable to work due to National Guard duties).
 
 
 60
 So it is here. An unauthorized alien cannot show that she is "ready, willing and able" to perform the work, during the time she was off work, because it would be in violation of the IRCA — i.e., illegal — for her to do so.[16] It is axiomatic that a contract with an illegal purpose bars enforcement of such contract; no damages are incurred by its breach. See Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 441; Adler v. Federal Republic of Nigeria, 219 F.3d 869, 880(9th Cir.2000) (contract to launder money fraudulently was illegal and unenforceable; "[h]ornbook law is that a contract is illegal if it [ ] has an illegal purpose"); Hedla v. McCool, 476 F.2d 1223, 1227 (9th Cir.1973) (contract for Seattle architects to design a building to be constructed in Alaska not enforceable where architects were not licensed in Alaska).
 
 
 61
 Moreover, the panel's conclusion that Hoffman stands for the proposition that backpay, frontpay and reinstatement are not available to plaintiffs suing under the NLRA alone because the NLRA is narrower than Title VII is incorrect. First, the panel correctly notes that the NLRA is enforced by the NLRB, while Title VII is primarily enforced by private causes of action. However, the question here is not who can vindicate the rights, but what damages can be recovered. As to backpay and frontpay, both the NLRA and Title VII provide them as remedies. The two enactments are not broader or narrower as to this remedy. They are similar.
 
 
 62
 Second, the panel argues that Title VII is broader than the NLRA because compensatory and punitive damages are recoverable under Title VII but are not under the NLRA. This argument ignores the explicit congressional policy prohibiting payment of wage loss damages to anyone who lacks the immigration status or nationality to have a legal right to earn the wages claimed to have been lost. The question is not whether unauthorized aliens are entitled to compensatory and punitive damages — they are — but what is the scope of the compensatory damages available under the two statutes. Courts have recognized that the remedial language of the two statutes is virtually identical. See, e.g., De La Rosa v. Northern Harvest Furniture, 210 F.R.D. 237, 238 (C.D.Ill.2002) ("the remedial language of the National Labor Relations Act is very similar to Title VII's language"); Local 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC, 478 U.S. 421, 447, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986) (noting that the enforcement provisions of Title VII were "modeled after [the NLRA]").
 
 
 63
 The NLRA provides for the following remedies:
 
 
 64
 If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without backpay, as will effectuate the policies of this subchapter.
 
 
 65
 29 U.S.C. § 160(c)(emphasis added).
 
 
 66
 Title VII provides for the following remedies:
 
 
 67
 If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without backpay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate.
 
 
 68
 42 U.S.C. § 2000e-5(g)(emphasis added).
 
 
 69
 Third, the panel notes that the NLRA is enforced by the NLRB, which is an administrative body of limited authority and Title VII is enforced by the federal courts. The panel points to language in Hoffman that the NLRB has the "discretion to select and fashion remedies for violations of the NLRA" and that such discretion, "though generally broad, is not unlimited" and concludes that it was only because of the NLRB's limited authority that it could not weigh the federal policy of abolishing unfair labor practices against U.S. immigration policy. Rivera, 364 F.3d at 1068(citing Hoffman, 535 U.S. at 142-43, 122 S.Ct. 1275). Please note, contrary to what the panel opinion argues, that it is not the NLRB that weighed the NLRA versus the IRCA and found the latter prohibited wage loss claims under the former. It was a federal court, just like the one the panel opinion says should do the weighing of "conflicting" policies. In that case, the federal court was the Supreme Court of the United States.
 
 
 70
 The panel then concludes that the district court in Rivera has the authority to make such a determination, opining that "the overriding national policy against discrimination would seem likely to outweigh any bar against the payment of back wages to unlawful immigrants in Title VII cases." Rivera, 364 F.3d at 1069. This argument is profoundly incorrect. The Hoffman decision does not rest upon such a slender reed. Rather, in holding that unauthorized aliens are not entitled to backpay under the NLRA, the Supreme Court reasoned that "[a]llowing the Board to award backpay to illegal aliens would unduly trench upon explicit statutory prohibitions critical to federal immigration policy, as expressed in IRCA." Hoffman, 535 U.S. at 151-52, 122 S.Ct. 1275. The same rationale applies here: allowing federal courts to award backpay to illegal aliens would also "unduly trench upon" federal immigration policy as codified in the IRCA. Id.
 
 
 71
 Finally, the panel cites no authority whatsoever for the proposition that the national policy against discrimination outweighs immigration policy, nor can it. Such an inquiry is inherently suspect. It is the province of Congress, not the courts, to weigh one policy against another, while it is "emphatically the province and duty of the judicial department to say what the law is." Marbury v. Madison, 1 Cranch 137, 177, 2 L.Ed. 60 (1803). It is dubious that Congress intended that the societal value of civil rights cases to be so important that the court should allow unauthorized aliens to violate the Immigration law. Such a proposition is utterly without antecedent. There is nothing in either the Hoffman opinion or caselaw to suggest that the policy concerns underlying Title VII trump the policy considerations of the IRCA. The "policy considerations" of the NLRA have been national policy since 1935, 30 years longer than those of the 1986 Immigration Reform and Control Act. On the limited issue of special economic damages for claimed lost wages, why can't that same 1986 Immigration Reform and Control Act trump the 1964 Civil Rights Act the way it did the 1935 Wagner Act?
 
 
 72
 More fundamentally, why should a district court have any greater discretion to fashion remedies for civil rights violations which "trench upon federal statutes and policies" unrelated to Title VII (such as prohibitions on unauthorized aliens working in the U.S.) than does the NLRB? The district court can still award remedies to vindicate Title VII rights such as (1) emotional distress damages, (2) punitive damages, and (3) attorneys' fees, all without "trenching upon" the IRCA policy of not allowing unauthorized aliens to work or to recover wage loss damages for work time loss in jobs to which they had no legal right.
 
 
 73
 By allowing the plaintiffs to refuse to answer questions, the answers to which might reduce their monetary recovery and make them vulnerable to removal, the panel accepts a gauzy and warm rationale for an evasion meant to impede the search for the truth. Such misguided compassion will surely corrupt the administration of our civil rights statutes, and threaten to bring them into public disrepute.
 
 
 74
 For these reasons, I respectfully dissent.
 
 
 
 Notes:
 
 
 *
 Honorable Eugene E. Siler, Jr., Senior Judge for the United States Circuit Court of Appeals for the Sixth Circuit, sitting by designation
 
 
 [1]
 The district court failed to act on suggestions of bifurcationSee Rivera v. Nibco, Inc., 364 F.3d 1057, 1068 (9th Cir.2004)
 
 
 [2]
 By granting the protective order, the district court improperly thwarted a core purpose of discovery: facilitation of settlement. Discovery that a plaintiff is not entitled to back wages because of her unauthorized alien immigration status would drive down the monetary value of the claim, and let both sides more realistically assess whether litigation for the value of the remaining claim is worthwhile. Indeed, "[d]iscovery on damages not only assists the parties in preparing for trial, it also educates each party on the other's view of the damages, which, in turn, assists each party in evaluating essential elements of the matters in issue and in assessing the risks associated with an adverse decision in the action."Johns Hopkins Univ. v. Cellpro, 160 F.R.D. 30, 35 (D.Del.1995). What is more, it will allow the defendant to make an offer of settlement by way of permission to take judgment in an amount, cutting off the plaintiffs' right to recover costs and attorneys' fees if the eventual award does not exceed the offer of judgment. See Fed. R. Civ. P. 68; Mallory v. Eyrich, 922 F.2d 1273, 1278 (6th Cir.1991).
 
 
 [3]
 The panel concludes that even ifHoffman precludes an award of backpay under Title VII, defendants are nevertheless still not entitled to a protective order because "Hoffman does not make immigration status relevant to the determination whether a defendant has committed national origin discrimination under Title VII." Rivera, 364 F.3d at 1074-1075. That is, the panel concludes that even if immigration status is relevant to a determination of damages, it is not relevant to a determination of liability. See Rivera, 364 F.3d at 1069-70(that the plaintiff is not eligible for certain remedies "merely goes to the issue of damages, not liability"). The panel's opinion signals a notion that a finding of liability alone can be a sufficient and satisfactory object of the action. In so doing, the panel overlooks basic tort law: a claim for relief requires not only a breach of duty, but also that the breach of duty caused damages. A breach of duty, without damages, is not actionable. However, discovery is generally not limited to relevant evidence of liability, but includes damages as well. See, e.g., Dogan Enterp., Inc. v. Hubsher, 1987 WL 20312, *6 (E.D.N.Y.1987) ("pretrial discovery as to damages is generally available since issues of liability and damages normally go to the jury at the same time"); Technograph, Inc. v. Texas Instruments, Inc., 43 F.R.D. 416, 419 (S.D.N.Y.1967) ("In general, discovery before trial as to damages is proper"). It makes no sense to bifurcate the proceedings for discovery purposes unless the court is going to "stage" proceedings to avoid needless discovery costs. In the final analysis, the panel correctly declines to bifurcate the proceeding. That decision is, in the first instance, a prerogative of the district court; the district court has not adopted bifurcation. But if no bifurcation occurs, defendants will not get another opportunity to take discovery with respect to damages. Id. at 1075. It also bears repeating the district court has not bifurcated the trial into liability and damages phases, so that a special verdict on liability above will not be rendered.
 
 
 [4]
 See, e.g., McKennon v. Nashville Banner Publishing Co., 513 U.S. 352, 360-363, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995) (noting that under the after-acquired evidence doctrine, an employee is precluded from receiving damages for wrongful discharge where the employer discovers evidence of wrongdoing that would have led to the employee's termination if the employer had known of the wrongdoing).
 
 
 [5]
 One must object to the mischief created — however unwittingly — by the magistrate judge's order. The district court's order would allow the defendant to conduct an independent investigation as to plaintiffs' immigration status, but not to ask about it during deposition. Surely plaintiffs would use the discovery process as a sword and ask defendant whether it had discovered plaintiffs' immigration status. Defendant's answer would allow plaintiffs to tailor their testimony. But before trial, and before plaintiffs' choice as to what position to take were made, a risk of litigation would continue to add to the plaintiffs' leverage in settlement because the most unassailable method of proving the truth would continue to be forbiddenSee Fletcher v. Union Pacific R.R. Co., 194 F.R.D. 666, 670 (S.D.Cal.2000) (Plaintiff is entitled to obtain pre-trial discovery of video surveillance tapes where plaintiff demonstrates substantial need for them and demonstrates that he cannot obtain without undue hardship).
 
 
 [6]
 In balancing private and public interests, courts have looked to the following factors:
 (1) whether disclosure will violate any privacy interests;
 (2) whether the information being sought is for a legitimate purpose or for an improper purpose;
 (3) whether disclosure of the information will cause a party embarrassment;
 (4) whether confidentiality is being sought over information important to public health and safety;
 (5) whether the sharing of information among litigants will promote fairness and efficiency;
 (6) whether a party benefiting from the order of confidentiality is a public entity or official; and
 (7) whether the case involves issues important to the public.
 See generally Phillips ex rel. Estates of Byrd v. General Motors Corp., 307 F.3d 1206, 1211-12 (9th Cir.2002) (citing Glenmede Trust Co. v. Thompson, 56 F.3d 476, 483 (3d Cir.1995)).
 
 
 [7]
 The term "chilling effect" was first introduced into the legal lexicon by Justice Frankfurter in his concurring opinion inWieman v. Updegraff, 344 U.S. 183, 195, 73 S.Ct. 215, 97 L.Ed. 216 (1952) (requirement that teachers take anti-Communist oath "has an unmistakable tendency to chill that free play of the spirit which all teachers ought especially to cultivate and practice"). See Donohoe v. Duling, 465 F.2d 196, 199 n. 6 (4th Cir.1972) (discussing history of the term). The term is usually used in connection with analyzing restrictions of free speech under the First Amendment. In such cases, a party is deprived of the ability to engage in certain forms of speech, guaranteed under the First Amendment, for fear of being prosecuted. Such cases are far different from the instant case, in which the plaintiffs allege that the so-called "chilling effect" dissuades them from maintaining a civil action seeking certain economic damages (i.e., backpay, frontpay and/or reinstatement), which are not only not guaranteed them, but are prohibited them, if they have no legal right to hold the job. It may be wrong to chill a teacher's "spirit" to range freely over unchartered grounds in a search for knowledge, but what is wrong with "chilling" the bringing of an ultimately unmeritorious claim for economic damages?
 
 
 [8]
 At plaintiffs' request, the trial court granted anin limine order banning questioning of plaintiffs' immigration status, but only after plaintiffs had waived claims for backpay and frontpay (loss of wages) caused by the claimed discrimination. I was the trial judge.
 
 
 [9]
 Moreover, the panel cites a law review article by Michael J. Wishnie,Immigrants and the Right to Petition, 78 N.Y.U. L. REV. 667, 676-79 (2003) for the proposition that unauthorized aliens are "reluctant to report a variety of labor and employment law violation." Rivera, 364 F.3d at 1065. Tellingly, however, that same law review article concedes that "though common sense suggests that undocumented workers are reluctant to report labor and employment violations to law enforcement agencies for fear they will expose themselves to deportation — and that this reluctance fosters further exploitation — there has been little empirical research on the extent and causes of immigrant underreporting." Id. at 677 (emphasis added). "Common sense," particularly that of special pleaders, should not be accepted as a substitute for evidence.
 
 
 [10]
 On March 1, 2003, the INS ceased to exist and its functions were transferred to the Department of Homeland Security. The U.S. Immigration and Customs Enforcement has assumed many of the INS's enforcement functionsHernandez v. Ashcroft, 345 F.3d 824, 828 & n. 2 (9th Cir.2003).
 
 
 [11]
 As NIBCO is all too likely to learn through its own investigation, allowed by the magistrate judge's order
 
 
 [12]
 Indeed, the administrative agency charged with enforcing Title VII rescinded its 1999 enforcement guidance entitled "Remedies Available to Undocumented Workers Under Federal Employment Discrimination Laws" after theHoffman decision was decided. See <http:// www.eeoc.gov/policy/docs/undoc-res cind.html> visited June 15, 2004. Moreover, the EEOC has cited Hoffman for the proposition that "relief may be limited if an individual subjected to discrimination does not have appropriate work authorization." See <http:// www.eeoc.gov/policy/docs/national-origin.html> visited June 15, 2004. The EEOC's determination is entitled to deference under Chevron USA Inc. v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). See EEOC v. Dinuba Medical Clinic, 222 F.3d 580, 589 (9th Cir.2000) (according deference to the EEOC's Enforcement Guidance discussing the compensatory and punitive damages available under Title VII).
 
 
 [13]
 But not always. Administrative remedies exist and are used both under Title VII (see 42 U.S.C. § 2000e-5) and California's FEHA (see Cal. Gov't Code §§ 12963).
 
 
 [14]
 The panel is correct that the Ninth Circuit has recognized that unauthorized aliens are entitled to the protections of Title VIISee EEOC v. Hacienda Hotel, 881 F.2d 1504 (9th Cir.1989). However, the question at issue is not whether Title VII applies to unauthorized aliens (it does), but which damage remedies are available — and which are not available — to unauthorized aliens under the statute.
 
 
 [15]
 Similarly, a plaintiff suing under California FEHA, Cal. Gov't Code §§ 12940et seq., (as do plaintiffs here, asserting pendant jurisdiction) may recover backpay, frontpay, reinstatement (see § 12790) in addition to compensatory and punitive damages (see e.g., Martinez v. Kirk xpedx, 2003 WL 21715875, *1 (N.D.Cal.2003) (successful plaintiff may recover compensatory and punitive damages under FEHA)). Cal. Gov't Code § 12790 provides, in pertinent part, that if the commission finds that defendant has engaged in an unlawful practice, plaintiff may be entitled to "hiring, reinstatement, or upgrading [ ], with or without backpay ... the payment of actual damages as may be available in civil actions under this part. Actual damages include, but are not limited to, damages for emotional injuries if the accusation or amended accusation prays for those damages."
 
 
 [16]
 Similarly, the backpay or frontpay or reinstatement remedy is only available where the damages werecaused by the discriminatory conduct. If the employment is terminated because of a good faith reason, e.g., where the plaintiff is incompetent; the plaintiff is disabled and cannot be made productive by "reasonable accommodations," the fact that he was also terminated because of discrimination does not entitle him to backpay or frontpay or reinstatement. Brady v. Thurston Motor Lines, 753 F.2d 1269, 1278-79 (4th Cir.1985) (employer was entitled to reduce backpay for periods when the employees were off work because of separate violations of work rules which caused termination).