449 F.3d 1106
 Ramon ZAMORA, Plaintiff-Appellant,
v.
ELITE LOGISTICS, INC., Defendant-Appellee.
Kansas Hispanic & Latino American Affairs Commission; Hispanic Ministry for the Archdiocese of Kansas City, Kansas; El Centro, Inc.; Apoyo Trabajador De Lawrence/Migrant Worker Solidarity of Lawrence; Harvest America Corporation, Amici Curiae.
 No. 04-3205.
 United States Court of Appeals, Tenth Circuit.
 June 5, 2006.
 
 Aldo P. Caller, Kansas City, KS, for Plaintiff-Appellant.
 Ryan B. Denk (Carl A. Gallagher with him on the brief) of McAnany, Van Cleave & Phillips, P.A., Kansas City, KS, for Defendant-Appellee.
 Marielena Hincapie and Anita Sinha, National Immigration Law Center, Oakland, CA, and Christopher Ho and William N. Nguyen, The Legal Aid Society — Employment Law Center, San Francisco, CA, filed an amici curiae brief on behalf of Plaintiff-Appellant.
 Before EBEL, HOLLOWAY and LUCERO, Circuit Judges.
 HOLLOWAY, Circuit Judge.
 
 
 1
 Plaintiff-appellant Ramon Zamora sued his former employer, defendant-appellee Elite Logistics, Inc., alleging it had discriminated against him on the basis of his race or national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. The district court granted the defendant's motion for summary judgment and issued a published opinion, 316 F.Supp.2d 1107 (D.Kan.2004). Plaintiff now brings this appeal.
 
 
 2
 * The following summary is drawn from the district judge's opinion, which gives a more detailed background.[1]
 
 
 3
 Plaintiff is originally from Mexico. He obtained a social security card in 1980 or 1981 and became a lawful permanent resident in 1987. It appears that he obtained United States citizenship during the months at issue in this appeal. He was hired by the employer in 2001, at which time he acknowledged that he was a Mexican citizen and showed proof of his legal status in the form of his alien registration card and his social security card. He also signed an I-9 form in which he stated under penalty of perjury that he was a lawful permanent resident.
 
 
 4
 In December 2001, just a few months after plaintiff's employment had begun, the employer received a tip that the Immigration and Naturalization Service (INS)[2] might soon conduct an inspection of the facility to investigate compliance with the immigration laws. The defendant employer was concerned because in the summer of 2000, in response to a strike, the employer had hired 300 people in a short period of time, and in its haste had likely not completed the appropriate I-9 forms. The I-9 form requires not only that the newly hired employee swear to his eligibility for employment but also that the employer verify that it has performed a visual inspection of documents submitted by the employee to support the declaration of eligibility, as required by the Immigration Reform and Control Act of 1986 (IRCA).
 
 
 5
 The employer's response to its perceived problem was to have the social security numbers of all of its 650 employees checked by two outside contractors. Both companies reported that someone else had used plaintiff Zamora's social security number in California in 1989, 1995, and 1997. On May 10, 2002, defendant's personnel director, Larry Tucker, called plaintiff in and told him that he had ten days to provide documentation showing that he had a right to work in the United States. This same procedure was used with all other employees whose social security numbers, when checked by the outside contractors, revealed apparent inconsistencies. The inquiries into the social security numbers of defendant's 650 employees reported apparent problems with the social security numbers of 35. Of these, all but four quit when asked for further documentation. Of the four who did not quit, only plaintiff supplied satisfactory documentation. This case arises from the plaintiff's efforts to supply that documentation and the employer's responses to those efforts.
 
 
 6
 Tucker testified by deposition that he did not call the toll free number provided by Social Security to verify information, did not ask plaintiff if he had ever worked in the towns in California where his number had been used, and instead decided to "put the burden of proof on the employee" because there were 35 employees whose right to work in the United States had been called into doubt by the results of the reports on their social security numbers. The passage of approximately six months from the time that the inquiries commenced until plaintiff Zamora was asked to supply additional documentation suggests, however, that Mr. Tucker was not proceeding hastily and may have, by that time, handled a good many of the other 34 cases, although this is not clear. When Tucker gave plaintiff a 10-day deadline, he also gave him a form (in English and in Spanish) telling him that he could be terminated if he failed to provide adequate documentation.
 
 
 7
 Although plaintiff was a legal resident, he did not bring any more documents in the ten day period. As far as we can determine, however, the defendant has never contended in this lawsuit that the documents plaintiff had supplied at the time of hiring were insufficient to establish his lawful status and right to work. On May 22, 2002, Tucker called plaintiff in for another interview. Plaintiff appeared with a union steward, Puentes, who also acted as an interpreter. Tucker told plaintiff he was off work indefinitely until he provided the documentation but could return to work if he did provide it. During this interview, Puentes accused Tucker of picking on Hispanic employees.
 
 
 8
 Later that same day,[3] plaintiff brought Tucker his naturalization certificate showing that he had become a United States citizen and a report of earnings from the Social Security Administration. The social security document only increased Tucker's concern, however, because it showed a different birth date than the one plaintiff had originally provided. Tucker did not accept the new documents, apparently because of the birth date discrepancy on the social security papers, and told plaintiff that he wanted social security papers or another social security number. Tucker told plaintiff not to return to work until he got another social security number. Plaintiff testified that he showed Tucker his social security card but that Tucker rudely told him that the number was stolen from someone else.
 
 
 9
 The next day plaintiff brought in a social security document, dated that same day and bearing an office stamp, which stated that the number was assigned to him. Tucker told plaintiff he would have to verify the document. Tucker had his secretary contact the Social Security Administration, and the information was confirmed. Two days later, May 25, 2002, the secretary called plaintiff and asked him to return to work.
 
 
 10
 On May 29, plaintiff came to the work place with a letter which in part stated: "Before I could consider going back to work I need from you two things: (1) an apology in writing, and (2) a complete explanation of why I was terminated." In his deposition, plaintiff testified that he would not have returned to work without these conditions being met. Tucker testified that he considered this a resignation because he was not going to apologize to plaintiff. Plaintiff testified that Tucker grabbed the letter and told him he was fired because Tucker would not apologize and did not have to explain.
 
 
 11
 In an e-mail to other human resources personnel that day, Tucker said that he had told plaintiff that his demands "were not acceptable and would not even be considered. I gave him his check from last week and ordered him out of the building." Tucker testified in his deposition that he may have told plaintiff to "just get the hell out."
 
 II
 
 The District Court's Analysis
 
 
 12
 In his opinion, the district judge noted that plaintiff alleged that he had suffered adverse employment action on May 22 when he was taken off work indefinitely and on May 29 when he was discharged. Defendant contended that neither event was an adverse employment action, and so that plaintiff had failed to make a prima facie case.[4] Alternatively defendant said that it had acted for legitimate reasons which plaintiff could not show to have been pretextual.
 
 
 13
 The judge decided that plaintiff had satisfied his prima facie burden with respect to both the May 22 suspension and the May 29 termination. As to the first claim, based on the May 22 suspension, the judge held that defendant had given a legitimate, neutral reason for its action — the fear of being fined if it were found not to have complied with its duty under IRCA not to knowingly employ illegal aliens. The judge found that plaintiff had not presented any evidence that the employer's stated justification was mere pretext for unlawful discrimination.
 
 
 14
 In that connection, the judge noted that ordinarily plaintiffs try to show pretext by showing that others were treated differently, but that in this case that could not be done because the employer had checked on the social security numbers of all employees and had given the same memorandum to all whose numbers were called into question by the inquiries it had made. The judge proceeded to consider whether plaintiff had shown pretext in some other way, and looked particularly at Tucker's rejection of the INS documents plaintiff had proffered and his specific demand for social security documents. But the judge opined that it was "highly significant" that when plaintiff did produce a certain social security document on May 23, Tucker had his secretary verify the document and then immediately offered to reinstate plaintiff. The evidence showed, the judge found, that the "sole impetus" behind Tucker's actions was a concern about the validity of plaintiff's documents.
 
 
 15
 The judge dismissed plaintiff's contentions about Tucker's failure to look at the documents in the defendant's own file from the time plaintiff was hired and his failure to call the phone numbers on the social security forms. Tucker had said that he had decided to put the burden on the employee as to all the social security numbers that had problems. The judge concluded there was "no suggestion" that Tucker was being biased in any way.
 
 
 16
 Plaintiff also contended below that it was a violation of IRCA (and therefore evidence of illegal bias under Title VII), for Tucker to reject his documents and to specifically demand social security documents. IRCA provides that an employer should not request "more or different documents ... or [refuse] to honor documents tendered that on their face reasonably appear to be genuine," 8 U.S.C. § 1324b(a)(6), but the judge said that this prohibition applied only with respect to hiring practices and not to the retention context of this case. The statutory provisions as to continuing employment are in another subsection, the judge noted, a subsection which does not contain the same prohibitions. Instead, that subsection merely says that it is unlawful to continue to employ an alien "knowing the alien is (or has become) an unauthorized alien." 8 U.S.C. § 1324a(a)(2). This puts an affirmative duty on employers, and it has been held that an employer is liable if it fails to investigate suspicious circumstances, the judge said, citing New El Rey Sausage Co. v. INS, 925 F.2d 1153, 1157-58 (9th Cir. 1991). Accordingly, defendant could not "turn a blind eye" to the information about plaintiff's number having been used in California, which "revealed potential problems." Therefore, the court concluded, defendant did not act illegally in demanding additional social security documents.
 
 
 17
 The judge's analysis then turned to the May 29 termination which followed plaintiff's demand for an apology and explanation. The judge rejected the employer's contention that plaintiff had voluntarily quit rather than having been terminated and so could not show that he has suffered an adverse employment action. The judge said that although the letter demanding an apology and an explanation could reasonably be construed that way, that was not the only possible construction. Also, plaintiff's testimony was that Tucker had grabbed the letter out of his hand and told him he was fired, arguably thereby discharging him before he could have quit.
 
 
 18
 The judge found, however, that Tucker was justified in believing that plaintiff would quit if the apology and explanation were not forthcoming. Therefore, defendant had succeeded in carrying its "extremely light"[5] burden of demonstrating a neutral reason for the discharge, and the focus shifted to whether plaintiff had proffered evidence of pretext. The court found he had not.
 
 
 19
 The judge first stated that the standard is good faith belief in the stated reasons, not whether the stated reasons were wise, fair or correct. Bullington v. United Air Lines, 186 F.3d 1301, 1318 (10th Cir.1999), overruled on other grounds by National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). The facts must be viewed as they appeared to the decision maker. So viewed, the evidence showed nothing to raise doubt about Tucker's stated belief that plaintiff would not come back to work without an apology. And while Tucker could have apologized and explained, courts do not act as "super-personnel departments" that second-guess employer's business judgments. The law does not require the employer to apologize.
 
 
 20
 In a concluding paragraph, the judge said that even if one could infer that Tucker had discriminated against plaintiff because of his citizenship, that is not the same as discrimination on the basis of national origin and is not covered by Title VII. That form of discrimination is covered by IRCA, but plaintiff brought his claim only under Title VII.
 
 III
 
 21
 * We review the district court's decisions on motions for summary judgment de novo, applying the same standard as the district court. See Trujillo v. University of Colo. Health Sciences Ctr., 157 F.3d 1211, 1213 (10th Cir.1998). Summary judgment is appropriate only if the admissible evidence shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" if, under the governing law, it could have an effect on the outcome of the lawsuit. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute over a material fact is "genuine" if a rational jury could find in favor of the nonmoving party on the evidence presented. Id. The burden of showing that no genuine issue of material fact exists is borne by the moving party. See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998). When, as in this case, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy this burden by identifying "a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." Id. at 671.
 
 
 22
 We will draw all reasonable inferences from the evidence in favor of the nonmoving party. See Curtis v. Oklahoma City Public Sch. Bd. of Ed., 147 F.3d 1200, 1214 (10th Cir.1998). If no genuine issue of material fact is presented, this court then determines whether the substantive law was correctly applied by the district court. See Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir.1996).
 
 B
 
 23
 As to the first alleged adverse employment action — the suspension of May 22 — the employer argues only that plaintiff presented no evidence that its proffered explanations were mere pretext for discriminatory actions. For purposes of this appeal, then, our analysis starts from the premise that the district court correctly found that plaintiff had established the elements of a prima facie case as to this incident. Our analysis is further narrowed by the fact that plaintiff concedes that the employer asserted a facially neutral reason for its actions. The defendant employer had posited that its motive was to avoid INS sanctions by checking the immigration status of its employees because it had reason to believe that it had employed illegal aliens in 2000 without complying with its duties under IRCA. Thus, the only issue on appeal is whether plaintiff made a sufficient showing of pretext to avoid summary judgment against him.
 
 
 24
 Plaintiff advances a number of reasons to support his contention that the proffered reason was merely pretext for an unlawful motive. He asserts that Mr. Tucker's demands for additional documents went beyond what is required under IRCA at the time of hiring to meet the employer's duty to ensure that a prospective employee has the right to work in this country, and in fact those demands would have been prohibited under the Act at the hiring stage. Mr. Zamora points to Mr. Tucker's decision not to examine the documents in his own office from the time of hiring. Further, plaintiff says, Mr. Tucker rejected documents that are specifically listed both in the Act and in the May 10 memorandum he received from Tucker as being sufficient.
 
 
 25
 Other evidence which Mr. Zamora cites as supporting an inference of pretext includes Mr. Tucker's decision not to check with the Social Security Administration to determine the validity of plaintiff's documents from that agency and, more generally, Tucker's decision to put the entire burden on the employee, rather than doing any further investigation himself. Additionally, Mr. Zamora relies on evidence that Mr. Tucker treated him rudely and characterizes Tucker's decision to suspend him as premature.
 
 
 26
 We conclude that, taken as a whole and in the light most favorable to Mr. Zamora, this evidence was sufficient to raise a question of fact as to whether the defendant's stated motive was a mere pretext for a prejudiced decision. Mr. Zamora first maintains that the company went beyond what is required for hiring practices under IRCA and indeed went beyond what is permitted under 8 U.S.C. § 1324b(a)(6) by demanding further documentation even though plaintiff had provided valid and adequate documentation when he was hired.[6] The district court held that § 1324b(a)(6) is not incorporated in § 1324a(a)(2), which establishes the employer's duties to investigate whether existing employees continue to be legally employable, and so apparently concluded that it was irrelevant that "one might conclude that Mr. Tucker may have been overly stringent in rejecting certain documents ...."
 
 
 27
 In any event, the judge said that this was insufficient to give rise to an inference of pretext, observing that it was "highly significant" that Tucker responded to the last document produced by plaintiff by instructing his secretary to verify the information and to ask plaintiff to return to work if verification was received. This evidence, the judge said, "reflects that the sole impetus behind Mr. Tucker's actions, cautious as they were, was a concern about the validity of plaintiff's right-to-work documents." 316 F.Supp.2d at 1118 (emphasis added). The court went on to say that the justification was not implausible or weak because "defendant could have been subjected to civil and criminal penalties if plaintiff had in fact turned out to be an undocumented alien." Id.
 
 
 28
 We are not persuaded by the district court's reasoning. Although a jury might agree with the judge on each point, we think it clear that the jury could also disagree. Because plaintiff does not assert error in the district judge's reading of 8 U.S.C. § 1324b(a)(6), which he held applied only to hiring practices and so did not apply to this defendant because it was verifying plaintiff's right to continue working, we assume, without deciding, that the district judge was correct on this point.[7] We think that, even assuming that it was not a violation of the Act for Mr. Tucker to demand additional documents — to be "overly stringent" as the district judge put it — a jury considering the entire context could determine that it was evidence of bias.
 
 
 29
 Here, plaintiff Zamora had at all times been legally in the country and authorized to work. He had established this when he was hired a mere nine months before he was asked to provide further documentation. Moreover, taking the evidence in the light most favorable to plaintiff, it was on May 22, the day of his suspension, that he produced his naturalization certificate, which should have, or at least a jury could conclude that it should have, permanently erased any doubts about his eligibility and any fears of employer liability under IRCA. But Mr. Tucker rejected the document, insisting that he wanted to see "social security papers or another SSN." 316 F.Supp.2d at 1112-13.
 
 
 30
 It is difficult to understand Tucker's apparent willingness to accept a different social security number, when it would seem that tendering a second number would be in effect an admission that plaintiff had gotten the job by fraud in the first place. In any event, we reject the conclusion that the evidence supports only the inference that the legitimate concern of avoiding IRCA liability was the "sole impetus" for Mr. Tucker's decisions, including the decision to reject a naturalization certificate and to indicate willingness to accept a second social security number. The district judge, as noted, found the employer's positive response to plaintiff's final tender of social security documents on May 23, "highly significant." The judge apparently did not find significant, however, the employer's negative response the previous day to the plaintiff's tender of his naturalization certificate, which should have removed any doubt that plaintiff had the right to work in this country. The judge failed to recognize that a reasonable jury could draw the inference of illicit discrimination from this response.
 
 
 31
 We also note that the district judge's statement that the defendant could have been liable for civil or even criminal penalties "if plaintiff had in fact turned out to be an undocumented alien" overstates the employer's exposure to penalties by implying that the employer is strictly liable for employment of undocumented aliens. To the contrary, the employer's duty, it appears, is to exercise due diligence and to investigate suspicious circumstances.[8] Thus, the employer is prohibited from continuing to employ an alien (and we reiterate that the evidence in the light most favorable to plaintiff shows that he had demonstrated proof of citizenship to the employer) "knowing" that the person is or has become unauthorized. Although there are few cases applying this provision, there is authority, as noted by the district court, that the employer may be held to constructive knowledge of the illegality. See New El Rey Sausage Co. v. INS, 925 F.2d 1153 (9th Cir.1991). We need not decide this question in this case but instead will assume, for our purposes, that our court would agree with the constructive knowledge standard. But see Collins Foods Int., Inc. v. INS, 948 F.2d 549, 555 (9th Cir.1991) (distinguishing New El Rey Sausage Co. and emphasizing that expanding employer liability by the doctrine of constructive knowledge may undercut Congressional intent to protect legal aliens: "To preserve Congress' intent ... then, the doctrine of constructive knowledge must be sparingly applied."). Thus, we agree that it could be a reasonable inference that Tucker was motivated by the desire to comply with the Act.[9]
 
 
 32
 We still are convinced, however, that a rational jury could find that Tucker had an unlawful motive, or that he had both the lawful motive of compliance with the immigration laws and an unlawful motive as well. After waiting six months from the time it first became concerned about its need to comply with IRCA, the employer suspended Zamora, who had provided valid and authentic documents less than one year previously, after giving him only ten days' notice, because of a report which indicated that someone else had used his social security number. The district judge cited New El Rey Sausage as authority that the defendant was bound to investigate suspicious circumstances but did not mention that case's specific caution against immediately suspending or terminating an employee. That court said that "even the INS concedes that `so long as the employer investigates the situation in a timely way, there seems to be no reason for an employer to suspend the worker during the investigation.'" 925 F.2d at 1158.
 
 
 33
 The defendant here had made no effort to distinguish between those persons who had been hired during the rush of 2000, when the employer apparently had proceeded in blithe disregard of its legal obligation, and those like plaintiff who had been hired during periods when the employer had been fulfilling its obligations under IRCA and so could have been presumed to have provided valid and sufficient documents at the time they were hired. A jury could conclude that Mr. Tucker jumped to the conclusion that Zamora had used a social security number illegally, despite the lack of any strong evidence that he had, and had apparently never considered the possibility that Zamora was instead a victim of the misuse of his social security number by another.
 
 
 34
 Surely the mere fact that another had used the social security number did not make it more likely than not that Zamora was the perpetrator, rather than the victim, of this violation. This, we think is the appropriate context for considering Mr. Zamora's contention that Mr. Tucker's failure to do any investigation of his own, such as contacting the Social Security Administration or even looking at the documents plaintiff had initially provided, could support an inference of pretext. Plaintiff concedes that Tucker had no duty to do these things. Still, plaintiff says, Tucker's decision to, as he put it, place the entire burden on the employee — even after the number of employees to be checked had been reduced to no more than four — could provide reasonable support for an inference of pretext. We agree.
 
 
 35
 Further, plaintiff testified that Tucker had been rude to him during their conversations. Although we recognize that Title VII was not intended to be a vehicle for enforcement of proper decorum, and therefore that rudeness is not per se actionable — i.e., it is not an adverse employment action[10] — it still may be regarded as relevant by a rational jury trying to determine the employer's motivation.
 
 
 36
 We conclude that a reasonable jury could find that the stated reason for the defendant's conduct was in fact a mere pretext for unlawful, discriminatory treatment of Mr. Zamora in the suspension of Zamora on May 22.
 
 C
 
 37
 As to the alleged termination of plaintiff's employment, the defendant on appeal does contest one element of the plaintiff's prima facie case — whether plaintiff has shown that he suffered an adverse employment action. Defendant contends that plaintiff resigned rather than being fired. Because we could affirm on this ground, we must consider this contention, even though the district court specifically rejected it. We agree with the district court's analysis and conclusion on this point. As the district judge said, although the letter the plaintiff presented to Mr. Tucker on May 29 could be construed as a resignation, it did not explicitly say that. Taking the evidence in the light most favorable to the plaintiff, Tucker grabbed the letter from plaintiff's hands and told him he was fired. We agree with the district judge that a jury could find that even if Mr. Zamora intended to resign, he was fired before he could do so.
 
 
 38
 We turn then, to whether plaintiff made a sufficient showing of pretext with respect to the events of May 29. Plaintiff's argument on this point emphasizes, correctly we think, that the previous events formed the context for the meeting of May 29 and must be considered. By the time Mr. Zamora and Mr. Tucker met on May 29, Mr. Tucker knew that Mr. Zamora was a naturalized citizen and that he, Tucker, had refused to accept the documentary evidence of this fact, evidence which alone should have sufficed to show Mr. Zamora's eligibility for employment and to assuage any concerns that defendant might be liable under IRCA. Mr. Tucker also knew that Mr. Zamora was and had throughout his employment been lawfully using his validly issued social security number. As a corollary, Mr. Tucker also knew, or a reasonable jury could conclude that a personnel officer of his training and experience should have known, that Mr. Zamora had been a victim of the misuse of his social security number by another. Mr. Tucker also could have (and a jury might conclude that he should have) realized that his refusal to accept Mr. Zamora's genuine documents might have seemed to Mr. Zamora to have been at the least discourteous, perhaps hurtful.
 
 
 39
 Mr. Tucker testified that he had no idea why Mr. Zamora should have felt that he was owed an apology. We agree with plaintiff's contention that a jury could conclude that this statement was unworthy of belief and that this alone might constitute evidence of pretext. Moreover, Mr. Tucker's expressed belief that Mr. Zamora had resigned appears to conflict with his reaction, which may have been to rudely tell Mr. Zamora that he was fired and to "just get the hell out." This again provides some evidence that the employer's stated reason was not worthy of belief. No more is necessary to support an inference that the actual motive was unlawful. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148-149, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); Randle v. City of Aurora, 69 F.3d 441, 453 (10th Cir.1995) ("Judgments about intent are best left for trial and are within the province of the jury.").
 
 
 40
 We again note that the manner of Mr. Tucker's response, which from the evidence could be seen as both rude and angry, is also relevant evidence that could support an inference of pretext. Given the evidence we have recited above, that Tucker knew by this time that Zamora was an American citizen whose social security number had been used without his knowledge by some unknown person, a jury might well wonder if Tucker's demonstrated lack of concern for Zamora was indicative of a biased attitude towards Mexican-Americans. Again, we recognize, as does Zamora, that Tucker had no legal duty to apologize. But Tucker did more than decline to apologize; he adamantly refused. A jury might find that he demonstrated both his anger and defensiveness and infer, based in part on that finding, that his motives were something besides protecting against IRCA liability. In other words, the jury could conclude that the proffered reason was not worthy of belief and could then properly consider whether to draw from that the crucial inference of prohibited discrimination.[11]
 
 
 41
 Accordingly, the summary judgment against the plaintiff-appellant must be reversed.
 
 
 
 Notes:
 
 
 [1]
 Appellant's appendix does not contain all of the district court filings that are required by 10th Cir. R. 10.3 & 30.1. Appellee has provided a nearly complete appendix. Appellee states in its brief that it accepts those facts recited in the appellant's brief that were adopted in the district court's Memorandum and Order from which this appeal is taken. We accordingly will decide the case on the district court's statement of the facts. The applicable rules which should be followed appear in 10th Cir. R. 30.1(A)(3) & 10.3(B)
 
 
 [2]
 The INS no longer exists as such, having been absorbed into the Department of Homeland Security. For simplicity, however, we will continue to refer to the INS in this opinion
 
 
 [3]
 The district judge noted that the summary judgment record was unclear regarding the chronology of events on May 22nd. The facts are considered in the light most favorable to plaintiff, as the party opposing the motion for summary judgment. Therefore, where the district judge stated that Zamora presented his naturalization certificate "on or about" May 22, we assume that the certificate was presented on that day
 
 
 [4]
 The defendant employer did not challenge any other part of plaintiff's prima facie case in the summary judgment papersSee 316 F.Supp.2d at 1116, 1119.
 
 
 [5]
 The judge was quotingAnaeme v. Diagnostek, Inc., 164 F.3d 1275, 1279 (10th Cir.1999).
 
 
 [6]
 Subsection 1324b(a)(6) provides that an employer's request for more or different documents than are required under subsection 1324a(b) or its refusal of documents that appear to be genuine "shall be treated as an unfair immigration-related employment practice if made for the purpose or with the intent of discriminating against an individual in violation of [8 U.S.C. § 1324b(a)(1)]."
 
 
 [7]
 Although we do not decide the issue because it is not argued by plaintiff, we note that what little authority we have found on the point does not support the district judge's reading of the statuteSee Getahun v. Office of the Chief Ad. Hearing Officer, 124 F.3d 591 (3d Cir.1997), in which the entire case, an administrative appeal and not a Title VII suit, was based on the premise that the employer had violated the "document abuse" rule by demanding additional documents. As in the instant case, the context there was the termination of an employee who had supplied valid and sufficient documents at the time of hiring. On remand to the agency, the administrative law judge imposed penalties on the employer. See 8 OCHAO 1041 (1999), and 8 OCHAO 1029 (1999).
 
 
 [8]
 The Act provides a good faith defense for employers who attempt to comply but fall short because of a "technical or procedural failure." 8 U.S.C. § 1324a(b)(6)
 
 
 [9]
 Although plaintiff does not raise the point, Mr. Tucker appears to have admitted in his deposition that his motivation was instead to ascertain whether Mr. Zamora was using a valid social security number. After he had expressed his concern about the report that plaintiff's number had apparently been used by someone else, Mr. Tucker was asked, "So it wasn't really a concern about whether he is entitled to work in this country, it was a concern about is he using the correct social security number?" Tucker replied, "Yes, sir." Aple.App. at 158
 
 
 [10]
 We have noted that "Title VII is not a `general civility code for the American workplace.'"Dick v. Phone Directories Co., 397 F.3d 1256, 1263 (10th Cir.2005) (quoting Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)).
 
 
 [11]
 We note that the dissent reasons that there is "no evidence in the record indicating that Tucker fired Zamora because he is an Hispanic from Mexico." Concurring/dissenting opinion at 1121 (footnote omitted). However, the dissent agrees that the evidence is sufficient for a jury to conclude that plaintiff's suspension, which was merely one week earlier, was motivated by unlawful bias. We believe the close proximity of events supports our conclusion that the evidence is sufficient on the termination claim as well
 
 
 
 42
 LUCERO, Circuit Judge, concurring.
 
 
 43
 On reflection, the agreement between the majority and the dissenting opinions that for analytical purposes we must assume that Zamora was fired, as well as the mutual agreement of my esteemed colleagues that a redressable claim remains as to the wrongful suspension, makes resolution of this appeal substantially easier. The unadorned question remaining is whether the evidence of discrimination supporting the wrongful suspension claim, coupled with the circumstances following Zamora's demand for an apology, are adequate to raise a material question of fact on the wrongful termination claim.
 
 
 44
 Taking the evidence in the light most favorable to the plaintiff, when confronted with the demand for an apology, Tucker angrily replied "just get the hell out." Based on this evidence, the evidence of discrimination supporting the wrongful suspension claim and the other evidence of discrimination in the record, a reasonable jury could reject Elite's stated reason for terminating Zamora as pretext and conclude that Zamora was fired for discriminatory reasons. Close cases on the facts ought best be left to a jury. Thus I join Judge Holloway's opinion.
 
 
 45
 Further, the issue discussed in footnote 7 of the majority opinion and footnote 4 of the dissent is not properly before this court. Zamora does not contest the district court's ruling that 8 U.S.C. § 1324b(a)(6) is not incorporated in § 1324a(a)(2).
 
 
 46
 EBEL, Circuit Judge, dissenting in part.
 
 
 47
 Plaintiff-Appellant Ramon Zamora asserts two Title VII disparate treatment claims. "Disparate treatment is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or other protected characteristic." Raytheon Co. v. Hernandez, 540 U.S. 44, 52, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003) (quotations, alterations omitted). "Liability in a disparate-treatment case depends on whether the protected trait actually motivated the employer's decision."[1] Id. (quotation, alteration omitted).
 
 
 48
 Zamora asserts that his employer, Elite Logistics, Inc. ("Elite"), treated him differently than it treated its other employees when Elite 1) suspended Zamora without pay on May 22, 2002; and 2) fired him on May 29, 2002. Zamora further alleges that Elite treated him differently because he is an Hispanic originally from Mexico. While I agree with the majority that Zamora has asserted sufficient evidence suggesting that Elite suspended him because of his race and national origin such that his first claim should survive summary judgment, I respectfully disagree that his second claim is also sufficient to survive summary judgment.
 
 
 49
 I. Suspension without pay.
 
 
 50
 The majority assumes that Zamora has established a prima facie claim of discrimination and that Elite has posited a legitimate, non-discriminatory reason for suspending Zamora — it suspended Zamora without pay in an effort to avoid violating the Immigration Reform and Control Act ("IRCA"). Like the majority, then, I will focus my analysis on the third step in the McDonnell Douglas[2] burden-shifting analysis. The question presented at this step is "whether there was sufficient evidence from which a jury could conclude that [Elite] ma[d]e its employment decision based on [Zamora's protected] status." Raytheon Co., 540 U.S. at 53, 124 S.Ct. 513. One of the ways that Zamora can establish that Elite discriminated against him would be to show that Elite's proffered legitimate reason for suspending Zamora was untrue and pretextual. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143, 147-48, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); see also Bryant v. Farmers Ins. Exchange, 432 F.3d 1114, 1125 (10th Cir.2005). "[P]retext may be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Bryant, 432 F.3d at 1125 (quotations omitted).
 
 
 51
 Unlike the majority, I conclude that for the most part Elite, in attempting to uncover any IRCA violations, treated Zamora in the same manner as it treated all of its other employees. Elite verified all of its employees' social security numbers. It rechecked the social security numbers about which concerns were raised. Only then did Elite asked all the employees whose numbers raised concerns to re-establish their eligibility to work in the United States. Pursuant to the terms of the memorandum Elite gave to these employees, any employee who did not bring in additional documentation within ten days would be suspended without pay. It was not until Zamora failed to take any action to comply with Elite's request within this ten-day time period that Elite followed its stated policy and suspended him without pay.[3] Up to this point, then, Elite had treated Zamora in the same manner as it treated all of its employees.
 
 
 52
 In addressing these steps Elite took to comply with IRCA, the majority makes two well-founded legal assumptions: 1) Elite could lawfully request that its employees produce documents, in addition to those the employees had presented when they were initially hired, in order to reverify the employees' right to work in the United States; and 2) once Elite became aware of concerns about the validity of Zamora's social security number, Elite had an obligation under IRCA to investigate this concern.[4] Additionally, Zamora concedes that Elite could lawfully put the burden on him to clear up any concerns about his work-eligibility status. And there is no suggestion in the record that Elite took these steps for any reason other to comply with IRCA.
 
 
 53
 However, when Zamora presented Elite with his naturalization certificate, see Zamora v. Elite Logistics, Inc., 316 F.Supp.2d 1107, 1112 (D.Kan.2004), a certificate establishing that Zamora was now a citizen of the United States and was, thus, certainly authorized to work in this country, Elite rejected that document. Moreover, that certificate was one of several documents that Elite had expressly indicated, in the memorandum it gave Zamora, that he could provide to clear up any work-eligibility problems. I agree with the majority, therefore, that Elite's rejection of Zamora's naturalization certificate provides sufficient evidence from which jury could decide that through this process of reverifying its employees' social security numbers, Elite was acting with the intent to discriminate against Zamora because he was from Mexico. More specifically, a jury could find, based upon Elite's rejection of the naturalization certificate, that Elite's proffered reason for taking these actions — to comply with IRCA — was untrue.
 
 
 54
 On this limited basis, I agree with the majority to reverse the district court's decision granting Elite summary judgment on this claim. In doing so, however, I do note the very slim evidentiary thread on which this reversal is based. Zamora has failed to present this court with any evidentiary support for his assertion that he presented his naturalization certificate to Elite, even though it is Zamora's obligation to provide an adequate appellate record which would enable this court to conduct its de novo review. See 10th Cir. R. 10.3, 30.1(A); see also Fed. R.App. P. 10(a), 30(a)(1); Travelers Indem. Co. v. Accurate Autobody, Inc., 340 F.3d 1118, 1120-21 (10th Cir.2003). Zamora apparently did present such evidence to the district court. See Zamora, 316 F.Supp.2d at 1112 (noting Zamora "testified in his deposition that on or about May 22, 2002, he presented [Elite] with his naturalization certificate"). And, as the majority indicates, Elite adopts the district court's factual statement for purposes of this appeal. Based upon that, then, I agree with the majority to reverse summary judgment entered for Elite on this first claim.
 
 II. Termination
 
 55
 After Zamora produced additional documentation from the Social Security Administration establishing that the social security number he had given Elite was in fact his number, Elite offered Zamora his job back. Zamora, however, requested an apology and an explanation before he would return to work. Elite's human resources manager, Larry Tucker, refused.
 
 
 56
 I assume, as did the majority, that Tucker then fired Zamora (as opposed to Zamora's having voluntarily resigned). Elite asserts that it fired Zamora because he asserted he would not return to work without an apology. Focusing again on the third McDonnell Douglas inquiry, the question presented is "whether there was sufficient evidence from which a jury could conclude that [Elite] did make its employment decision based on [Zamora's protected] status." Raytheon Co., 540 U.S. at 53, 124 S.Ct. 513. But I see no evidence in the record indicating that Tucker fired Zamora because he is an Hispanic from Mexico.[5] The fact that Elite offered Zamora his job back suggests Elite was not discriminating against him on those bases. And even Zamora concedes that Elite had no legal obligation to apologize. Because Zamora has failed to produce any evidence from which "a jury could conclude that [Elite] ma[d]e its employment decision based on [Zamora's protected] status," summary judgment for Elite was warranted. Raytheon Co., 540 U.S. at 53, 124 S.Ct. 513. Therefore, I must respectfully disagree with the majority; I would affirm summary judgment for Elite on this claim.
 
 
 
 Notes:
 
 
 [1]
 By contrast, disparate-impact claims involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. Under a disparate impact theory of discrimination, a facially neutral employment practice may be deemed illegally discriminatory without evidence of the employer's subjective intent to discriminate that is required in a disparate-treatment case
 Raytheon Co., 540 U.S. at 52, 124 S.Ct. 513 (quotations, alterations omitted). Zamora has not asserted a disparate-impact claim.
 
 
 [2]
 McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).
 
 
 [3]
 While an immediate suspension might be "problematic," if an employee, once asked, refuses to provide further documentation, "the employer could conclusively infer that the employees did not have proper authorization andshould terminate them." New El Rey Sausage Co. v. United States INS, 925 F.2d 1153, 1158-59 & 1159 n. 9 (9th Cir. 1991) (emphasis added).
 
 
 [4]
 Although 8 U.S.C. § 1324b(a)(6) provides that an employer cannot request "more or different documents than" § 1324a(b) requires, § 1324b(a)(6) only "concerns the documents that an employer may request when fulfilling its mandatory duty to investigate immigration statusupon hiring, recruiting, or referring new employees." Rivera v. NIBCO, Inc., 364 F.3d 1057, 1074 (9th Cir.2004) (addressing discovery request). And "if an employer unknowingly hires an unauthorized alien, or if the alien becomes unauthorized, the employer is compelled to discharge the worker upon discovery of the worker's undocumented status." Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. 137, 148, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002) (citing to 8 U.S.C. § 1324a(a)(2)). For that reason, if an employer becomes aware of circumstances indicating that an employee is not authorized to work in the United States, the employer must take steps to investigate that possibility, even if the employee submitted ostensibly valid documentation when the employee was originally hired. See Mester Mfg. Co. v. INS, 879 F.2d 561, 568-69 & 569 n. 11 (9th Cir. 1989); see also Getahun v. Office of Chief Admin. Hearing Officer of Executive Office for Immigration Review, 124 F.3d 591, 596 (3d Cir.1997) (holding employer was required to ask employee for further documentation when employer's self-audit of its employee files revealed that plaintiff's driver's license and work authorization document had expired); Mountain High Knitting, Inc. v. Reno, 51 F.3d 216, 220 (9th Cir.1995) (upholding INS's requiring employer to recheck documentation after INS audit revealed discrepancies in those employees' documentation); New El Rey Sausage Co., 925 F.2d at 1158 & n. 7 (9th Cir.1991) (interpreting INS regulation to require employer to update employee's I-9 information once employer becomes aware documents employee originally presented were false); Mester Mfg. Co., 879 F.2d at 566-67 (upholding determination that employer violated IRCA when employer took no action after receiving notice from INS that employees were possibly using false work authorization cards); cf. 8 C.F.R. § 274a.1(l)(1) (defining "knowing" to include both actual and constructive knowledge). IRCA "does not require that th[is] knowledge come to the employer in any specific way" before triggering the employer's obligation to investigate. Mester Mfg. Co., 879 F.2d at 566. And "[n]otice that [documents the employee submitted when he was originally hired] are incorrect places the employer in the position it would have been if the alien had failed to produce the documents in the first place: it has failed to adequately ensure that the alien is authorized." New El Rey Sausage Co., 925 F.2d at 1158.
 Even if IRCA did not permit Elite to request documentation in addition to what the employee produced when he was originally hired, such a request would violate IRCA only if the employer made that request with the intent to discriminate. See 8 U.S.C. § 1324b(a)(6); see also Rivera, 364 F.3d at 1074; Robison Fruit Ranch, Inc. v. United States, 147 F.3d 798, 799-802 (9th Cir. 1998). Zamora has not made such a showing in this case because it is undisputed that Elite checked all of its employees' social security numbers and further requested that all employees with numbers raising concerns provide additional documentation of their eligibility to work in the United States. See Robison Fruit Ranch, Inc., 147 F.3d at 799-802 (holding employer did not discriminate when it improperly asked all of its new hires for designated and additional documents).
 Finally, even if we could say that Elite violated IRCA by checking its employees' social security numbers and requesting that all the employees with numbers raising concerns provide further documentation, that does not necessarily establish that Elite was acting with the intent to discriminate on the basis of race or national origin, in violation of Title VII. If Elite was actually motivated to suspend Zamora by its belief, even if mistaken, that it was complying in good faith with IRCA, Elite cannot be liable under a disparate-treatment theory for intentionally treating Zamora differently because he is an Hispanic originally from Mexico. See Raytheon Co., 540 U.S. at 52, 124 S.Ct. 513 ("Liability in a disparate-treatment case depends on whether the protected trait actually motivated the employer's decision.") (quotations, alterations omitted); cf. Sorbo v. United Parcel Serv., 432 F.3d 1169, 1178 (10th Cir.2005) (holding the relevant inquiry is the employer's belief that the employee committed misconduct, not whether the employee in fact committed the misconduct); Kendall v. Watkins, 998 F.2d 848, 850-52 (10th Cir.1993) (concluding that employer had asserted a legitimate non-discriminatory reason for not considering plaintiff's employment applications, based upon the employer's interpretation of a settlement agreement, even if that interpretation was incorrect). Zamora would still be able to assert a claim against Elite for document abuse in violation of IRCA, a claim that he has not pursued in this litigation. See generally General Dynamics Corp. v. United States, 49 F.3d 1384, 1384-85 (9th Cir.1995) (discussing process by which employee can challenge employment practice as violating IRCA).
 
 
 [5]
 In concluding that Zamora established a triable issue as to whether Elite's reason for terminating Zamora was pretextual, the majority relies to a great extent on the "previous events" leading up to Zamora's suspension and Elite's proffered reinstatement. As discussed in the previous section, however, I do not agree with the majority that most of these preceding events suggest Elite was discriminating against Zamora because he was originally from Mexico